**No. 18-55599**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CITY OF LOS ANGELES,

Plaintiff-Appellee,

v.

JEFFERSON B. SESSIONS III, et al.

Defendants-Appellants.

On Appeal from the United States District Court
for the Central District of California

### BRIEF FOR APPELLANTS

CHAD A. READLER
  *Acting Assistant Attorney General*

NICOLA T. HANNA
  *United States Attorney*

MARK B. STERN
DANIEL TENNY
KATHERINE TWOMEY ALLEN
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

STATEMENT OF JURISDICTION ......................................................................3

STATEMENT OF THE ISSUES............................................................................3

PERTINENT STATUTES AND REGULATIONS ...............................................4

STATEMENT OF THE CASE...............................................................................4

    A.    Statutory Background...............................................................................4

    B.    Factual Background & Prior Proceedings................................................9

SUMMARY OF ARGUMENT............................................................................ 11

STANDARD OF REVIEW ................................................................................. 15

ARGUMENT ...................................................................................................... 16

I.    The Challenged Provisions are Permissible Considerations in Evaluating Applications for a Competitive Federal Law Enforcement Grant Program....................................................................................................... 16

II.    The Challenged Provisions Do Not Implicate Spending Clause Concerns ...... 29

CONCLUSION ................................................................................................... 34

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Barbour v. Washington Metro. Area Transit Auth.*,
   374 F.3d 1161 (D.C. Cir. 2004) ............................................................32

*Bennett v. Kentucky Dep't of Educ.*,
   470 U.S. 656 (1985) .......................................................... 15, 30-31, 31

*Davis v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629 (1999) ............................................................... 15, 30

*Davis v. United States*,
   854 F.3d 594 (9th Cir. 2017) ............................................................15

*Demore v. Kim*,
   538 U.S. 510 (2003) ............................................................... 20, 28

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ............................................................29

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ............................................................... 15, 32

*Independent Acceptance Co. v. California*,
   204 F.3d 1247 (9th Cir. 2000) ............................................................28

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018) ............................................................20

*Kern Cty. Farm Bureau v. Allen*,
   450 F.3d 1072 (9th Cir. 2006) ............................................................28

*Mayweathers v. Newland*,
   314 F.3d 1062 (9th Cir. 2002) ............................................................ 31, 32

*Mistretta v. United States*,
   488 U.S. 361 (1989) ............................................................19

*Morton v. Ruiz,*
    415 U.S. 199 (1974) ..................................................................................19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ....................................................................................29

*National Fed'n of Indep. Business v. Sebelius,*
    567 U.S. 519 (2012) ..................................................................................33

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ................................................................................ 30, 31

*Whitman v. American Trucking Ass'ns,*
    531 U.S. 457 (2001) ........................................................................... 19, 22

*Will v. Michigan Dep't of State Police,*
    491 U.S. 58 (1989) ....................................................................................32

**Statutes:**

Administrative Procedure Act,
    5 U.S.C. § 706(2)(A) .............................................................................. 9, 10

Justice for Victims of Trafficking Act of 2015,
    Pub. L. No. 114-22, tit. VI, § 601, 129 Stat. 227 .........................................22

Violent Crime Control and Law Enforcement Act of 1994,
    Pub. L. No. 103-322, tit. I, § 10003(a), 108 Stat. 1796: ....................4, 16, 21
        34 U.S.C. § 10381(b) ....................................................................4, 11, 16
        34 U.S.C. § 10381(b)(1) ................................................................1, 5, 16
        34 U.S.C. § 10381(b)(2) ................................................................1, 5, 16
        34 U.S.C. § 10381(b)(4) ................................................................ 17, 24
        34 U.S.C. § 10381(c) ...................................................................10, 12, 22
        34 U.S.C. § 10381(c)(1) ..............................................................5, 12, 22
        34 U.S.C. § 10381(c)(2) ............................................................................5
        34 U.S.C. § 10381(c)(2)-(3) ............................................................ 12, 22
        34 U.S.C. § 10381(c)(3) ............................................................................5
        34 U.S.C. § 10381(f) ................................................................................5
        34 U.S.C. § 10381(f)-(h) ..........................................................................6
        34 U.S.C. § 10381(g) ................................................................................5
        34 U.S.C. § 10381(h) ................................................................................5

34 U.S.C. § 10382(c)(4) ................................................. 18, 21

34 U.S.C. § 10382(c)(10) ................................. 13, 17, 23, 24, 33

8 U.S.C. § 1226(c)(1) ...................................................... 9

8 U.S.C. § 1231(a)(1)(B) .................................................. 9

8 U.S.C. § 1357(g) ........................................................ 8

28 U.S.C. § 1292(a)(1) .................................................... 3

28 U.S.C. § 1331 .......................................................... 3

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ................................................ 3

**Legislative Material:**

H.R. Rep. 103-324 (1993) ................................................ 17

**Other Authorities:**

FY 2015 Award Methodology,
    https://cops.usdoj.gov/pdf/2015AwardDocs/chp/
    2015-CHP-Methodology.pdf .......................................... 18

FY 2017 Performance Budget, Office of Community
    Oriented Policing Services, https://www.justice.gov/
    jmd/file/821491/download ....................................... 19-20

iv

# INTRODUCTION

Since the early 1990s, the Office of Community Oriented Policing Services (COPS Office) within the Department of Justice has administered several law enforcement grants, including the COPS Hiring Program (CHP), which provides localities with funds to hire or rehire law enforcement officers "for deployment in community-oriented policing." 34 U.S.C. § 10381(b)(1), (2). The number of eligible applicants exceeds annual appropriations for the program, and, because the governing statute establishes only a few general guideposts for allocating funds, the COPS Office has exercised broad discretion in establishing funding priorities for the limited federal dollars available. The Office has developed a scoring system which analyzes the robustness of each proposal and which assigns additional points based on policy priorities. For example, the COPS Office has prioritized funding for jurisdictions that suffer "catastrophic events" (such as a terror attack or a mass shooting) and for jurisdictions with high crime rates.

The Office has also encouraged jurisdictions to design community-oriented policing programs that fit into one of a number of designated "focus areas" that reflect the Department's law enforcement priorities. These priorities, of course, change over time, consistent with changes in national law enforcement and public safety needs. For example, in the wake of the 9/11 attacks, "Homeland Security" became a much more pressing federal law enforcement priority, and thus the CHP has included that as a focus area. Likewise, in the wake of tragic school shootings,

school safety is a national law enforcement priority, and thus CHP has included "School Resource Officers" as a focus area. In the wake of high-profile police shootings and follow-on protests, police-community relations is a national law enforcement priority, and thus CHP has included "Building Trust" as a focus area. *See infra* at 7, 18. None of these focus areas—reflective of Department policy preferences—has ever been the subject of objection by applicants, Congress, or federal courts.

In 2017, the Department included another focus area that is consistent with federal law enforcement priorities, as established by Congress. Namely, CHP included "Illegal Immigration" as a focus area, and also indicated that it would assign additional points to jurisdictions that facilitate the transfer of aliens subject to deportation proceedings to federal custody upon their release from jail.

The district court recognized that the COPS Office necessarily has discretion to establish priorities in order to evaluate competing applications. It nevertheless held that including Illegal Immigration as a focus area exceeds the Office's statutory authority. The court, however, fundamentally misunderstood the nature of the CHP program. Community-oriented policing is a strategy that can be applied in a wide range of contexts, and all grant applications, regardless of their focus area, must be rooted in the broad principles of community-oriented policing. Nothing in the statute divests the COPS Office of the discretion to prioritize certain law enforcement goals to be achieved through community-oriented policing. Nor does the statute preclude

2

the COPS Office from giving some weight to a jurisdiction's willingness to assist in an orderly transfer of custody. The decision below would change all that and would, if adopted here, severely curtail the Department of Justice's longstanding discretion to administer this program.

The district court's ruling rested on grounds that would seem to invalidate virtually every other discretionary basis the Department has used to administer this program. That constrained interpretation is clearly not what Congress intended, as the statutory text and the Department's long history administering this program confirm. Nor is it what the Constitution requires, or else every discretionary grant program where Congress fails to explicate every potential basis for prioritizing funding is equally impermissible. The district court's decision was incorrect on all counts. It should be reversed.

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. § 1331. On April 11, 2018, the district court granted partial summary judgment on three counts in plaintiff's complaint and entered a permanent injunction as to those counts. ER 8, 10, 11, 13. The government filed a timely notice of appeal on May 4, 2018. ER 14-15; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

The Department of Justice administers a discretionary law enforcement grant program that provides funds to localities to hire or rehire officers for deployment in

3

community-oriented policing. 34 U.S.C. § 10381(b). Because Congress annually appropriates less in funds than jurisdictions seek under the program and has not laid out specific criteria for selecting applicants, the Department has developed a variety of scoring factors to assess applications. Los Angeles challenges two scoring factors introduced in the fiscal year 2017 grant cycle relating to a jurisdiction's cooperation with federal efforts to enforce the immigration laws by removing aliens who have committed crimes from the country. The issues presented are:

Whether the district court erred in holding that Department was not acting within its delegated discretion in considering the immigration-related scoring factors.

Whether the district court erred in holding that consideration of immigration-related factors contravened the Spending Clause.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Statutory Background

The Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. I, § 10003(a), 108 Stat. 1796, 1808, provides the Department of Justice with authority to make discretionary grants for a variety of statutory purposes related to public safety and community-oriented policing. *See* 34 U.S.C. § 10381(b). To administer these grants, the Department has created the Office of Community Oriented Policing Services (COPS Office). The COPS Office manages the

4

application process for a variety of grants provided for in the statute, including the COPS Hiring Program (CHP), which provides localities with funds to hire or rehire law enforcement officers "for deployment in community-oriented policing." *Id.* § 10381(b)(1), (2). The statute does not define "community-oriented policing."

The CHP receives applications for more funds than Congress annually appropriates, and the application process is thus competitive. The statute sets forth some parameters for that process. It mandates that jurisdictions in all states receive some funding as long as eligible applications are submitted, *see* 34 U.S.C. § 10381(f), that available funds be divided equally between large and small jurisdictions, *see id.* § 10381(h), and that, unless waived, jurisdictions contribute a certain amount of their own funds in addition to the grant money used to hire or rehire an officer funded by the CHP, *see id.* § 10381(g). The statute also states that the Attorney General may "give preferential consideration" to applications that provide more than the mandatory minimum local contribution to the hiring or rehiring of an officer, *see id.* § 10381(c)(1), or to applications where the applicant is from a state that has certain laws in place to combat human trafficking, *see id.* § 10381(c)(2), (3).

Because these factors alone are insufficient to distinguish among the many applicants for CHP funds, the COPS Office has developed a multi-factor weighted scoring system to assess applications on the basis of a "point" score. ER 20-23, ¶¶ 12-19. Applicants are first scored on a variety of individual factors. ER 21, ¶ 15. The scores on the various factors are then grouped into three categories—Fiscal

5

Health, Crime, and Community Policing—and the aggregate score in each category is weighted to produce a final score by which jurisdictions are ranked. ER 23, ¶ 20. CHP funds are then distributed according to this ranking and the requirements spelled out in 34 U.S.C. § 10381(f)-(h). ER 23, ¶ 21.

The scoring factors employed in this process are wide-ranging, reflecting the broad purposes of the community-oriented policing program, changing law enforcement needs, and the priorities of the Department of Justice. For example, applicants are required to submit data on local crime statistics, and jurisdictions with higher crime rates receive more points in the scoring process. ER 21, ¶ 16. Similarly, applicants must submit data about their financial condition, and jurisdictions with greater financial need receive additional points. *Id.* Applicants are likewise scored on the quality of the community-oriented policing plan they submit. *Id.*

Other factors have been developed in response to law enforcement needs. The COPS Office began providing bonus points to jurisdictions that have experienced a "catastrophic event," such as a terrorist attack or mass shooting, a decision that reflected concerns that arose when the Department was unable to award a grant to Newtown, Connecticut after it suffered a mass shooting. ER 22, ¶ 18. These bonus points resulted in an award of a CHP grant to San Bernardino, California, the year after a terrorist attack there. *Id.* In addition, the application accords additional points for adopting specified internal management practices, such as ensuring flexibility in officer shift assignments, assessing employee satisfaction, and using an "early

6

intervention system" to identify and assist officers who may be under particular strain. *Id.*

Since the fiscal year 2011 grant process, the COPS Office has given extra points to applications that promise to use funding to support designated "focus areas." ER 18, ¶ 7; ER 22, ¶ 18. These focus areas enable the Department to prioritize community-oriented policing in certain areas, and for each focus area, the applicant must explain how its proposal will "incorporate the principles of community oriented policing." ER 18, ¶ 7. For the fiscal year 2017 CHP, the COPS Office identified nine focus areas. *Id.* For example, applicants could choose the "Drug Abuse" focus area, offering a proposal that explained how the applicant planned to use community-oriented policing principles "to combat drug use and abuse." ER 18-19, ¶ 8. Similarly, applicants could tailor their plans to use CHP funds to address "Homeland Security Problems," including "addressing threats against facilities" and developing "criminal intelligence capacity." *Id.*

None of these aspects of the application and screening process—the many scoring factors, the several focus areas—are spelled out in the statute. Instead, the COPS Office has long exercised, within the CHP, the discretion that is inherent in *discretionary* grants. In connection with the fiscal year 2017 CHP applications, the COPS Office included a focus area for "Illegal Immigration." The CHP application asked jurisdictions selecting this focus area to "specify your focus on partnering with federal law enforcement to combat illegal immigration through information sharing,

7

287(g) partnerships [*see* 8 U.S.C. § 1357(g)], task forces and honoring detainers." ER 24, ¶ 24. Applicants selecting this focus area, like applicants selecting other focus areas, were required to explain how their proposal would "incorporate the principles of community-oriented policing." ER 18, ¶ 7. This focus area was designed to facilitate greater cooperation between localities and the federal government in efforts to reduce crime by removing from the country aliens who have committed, or are suspected of committing, criminal offenses. Applicants who selected this focus area, like applicants choosing the "Violent Crime Problems" or "Homeland Security Problems" focus areas, received additional points for that selection. ER 22, ¶ 18.

The COPS Office similarly offered jurisdictions applying for a fiscal year 2017 CHP grant the opportunity to receive bonus points if they certified that they had in place, or would implement, policies designed to assist federal law enforcement authorities by 1) permitting officials from the Department of Homeland Security (DHS) access to the applicant's correctional or detention facilities to meet with a given detainee and "inquire as to his or her right to be or to remain in the United States," and 2) providing advance notice to DHS of "the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien." ER 24-25, ¶ 25.

The cooperation envisioned by these two new scoring factors reflects the structure of the Immigration and Nationality Act (INA), which ties certain triggering events in the removal process to an alien's involvement in state criminal proceedings

8

and release from state custody. For example, Congress has mandated that certain aliens who have committed criminal offenses be taken into federal custody pending removal proceedings, but only "when the alien is released" from state custody. 8 U.S.C. § 1226(c)(1). Similarly, with respect to incarcerated aliens subject to a final removal order, the INA establishes a "removal period" of 90 days that begins with the date of the alien's release. *Id.* § 1231(a)(1)(B). Many jurisdictions already provide this basic level of cooperation to federal immigration authorities; indeed, a substantial proportion of applicants availed themselves of the bonus points. ER 27, ¶ 33.

### B. Factual Background & Prior Proceedings

Los Angeles brought this suit in August 2017. As relevant here, the City's complaint asserted that the new scoring factors—the Illegal Immigration focus area and the bonus points for immigration cooperation—were ultra vires, ran afoul of Spending Clause and Tenth Amendment constraints, and were arbitrary and capricious under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A).[1] The district court entered summary judgment for Los Angeles and a permanent injunction barring use of the focus area and bonus points in scoring CHP applications.

---

[1] Los Angeles's suit also challenged conditions placed on the Edward Byrne Memorial Justice Assistance Grant, an unrelated grant program administered by a different Department of Justice component. Proceedings on those counts are currently in abeyance pending litigation developments in other courts. *See* Dkt. No. 77.

On the merits of Los Angeles's claims, the court held that the COPS Office lacks the statutory authority to use the scoring factors at issue. ER 6. The court first declared that the list of enumerated factors in 34 U.S.C. § 10381(c) that allow the Attorney General to provide certain applicants with preferential treatment "must be read to exclude others" because reading it as nonexclusive would "effectively render[] subsection (c) superfluous." ER 6-7. At the same time, however, the court recognized that these specific factors did not preclude the Attorney General from exercising discretion to "select applicants with programs that best embody the statutory purpose of the CHP grant." ER 7. The court nevertheless held that the Department could not award points to applications in the Illegal Immigration area, and also held that the Department could not assign points to jurisdictions that cooperate with the federal government with respect to aliens in state or local custody who are subject to removal proceedings. The court declared its view that cooperation to ensure that aliens subject to removal do not return to the community upon completion of a criminal sentence cannot "improve cooperative efforts" between police and the community, and advances only "policing generally," not "*community policing*." ER 8.

The court further held that the Department had not provided "a 'reasonable basis' for imposing" the scoring factors, ER 10, and had therefore acted arbitrarily and capriciously. *See* 5 U.S.C. § 706(2)(A). The court stated that the Department's

10

rationale—that removing criminals from the community reduces crime and improves public safety—was not "based . . . on any findings or data." ER 10.

The court also concluded that the scoring factors ran afoul of Spending Clause constraints. The court first held that "Congress did not unambiguously condition receipt of a CHP grant on local compliance with federal authorities." ER 9. Second, it believed that the scoring factors "are not 'reasonably related' to the articulated goal of the COPS program," which is "about developing partnerships between local authorities and the community." *Id.*

Based on these conclusions, the district court entered a permanent injunction barring the Department of Justice from using the scoring factors in future CHP grant cycles. ER 13. The district court did not discuss how, under its holding, any of the other scoring factors or focus areas that have long been a part of the CHP could be upheld.

## SUMMARY OF ARGUMENT

**A.** This case concerns the administration of a law enforcement grant program that provides funds to localities to hire or rehire officers for deployment in community-oriented policing. *See* 34 U.S.C. § 10381(b). Beyond some general guidelines, Congress has left it to the COPS Office of the Department of Justice to establish criteria and priorities for evaluating grants competing for limited federal funds, as Congress does with many other grant programs. For many years, the COPS office has undertaken these discretionary determinations on the basis of a scoring

11

system that evaluates the merits of each proposal and also awards additional points based on a variety of factors, including, for example, a district's crime rate. The COPS Office has also assigned additional points to proposals to advance community-oriented policing in areas of special concern, including Homeland Security and violent crime. Congress has been made aware of the grant evaluation procedures in the Department's annual budget reports, and we are aware of no instance in which Congress or grant applicants questioned the legality of these procedures.

That changed with the filing of this suit. Los Angeles declared that it did not plan to file an application in the "Illegal Immigration" focus area, which is one of the priority focus areas. It urged that the COPS Office lacked authority to establish this priority and that, indeed, the award of points to community-oriented policing projects in this area would violate the Spending Clause. The City also argued that the COPS Office could not assign extra points to jurisdictions that tell the federal government when they plan to release prisoners subject to federal removal proceedings or grant federal officials access to prisoners to inquire as to their immigration status.

The district court accepted these arguments in a decision that is by turns inconsistent and conclusory. The court noted that one provision of the statute, Section 10381(c), prioritizes jurisdictions that provide greater than 25% matching funds, 34 U.S.C. § 10381(c)(1), or that have certain laws related to human trafficking, *id.* § 10381(c)(2)-(3). To establish additional priorities, the court declared, would render section 10381(c) "superfluous." ER 6. Having purported to strike down the

12

immigration-related provisions on this ground, however, the district court immediately acknowledged that the statutorily mandated considerations are not, in fact, sufficient to allow the COPS Office to determine which jurisdictions should receive grants. Plainly, the federal government can determine that some areas of community-oriented policing are particularly worthy of limited federal dollars.

The district court was on no firmer ground in then singling out illegal immigration as an impermissible priority area, declaring that a focus on illegal immigration matters has "nothing to do" with community-oriented policing. The court fundamentally misunderstood the purpose of a focus area and the relation of the focus area to the program as a whole. The Illegal Immigration focus area, like the other focus areas, encourages localities to use their community-oriented policing expertise and knowledge of local conditions to propose community-oriented policing programs that will address pressing public safety needs identified by the Department. Choosing this or any other focus area does not relieve an applicant of the burden to demonstrate that its proposed program "incorporate[s] the principles of community-oriented policing." ER 18, ¶ 7. Regardless of which focus areas they choose, applicants must explain how their proposal will use CHP funds to "reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing," 34 U.S.C. § 10382(c)(10).

13

The COPS Office is entitled to select grant applicants with strong proposals in the area of immigration in the same way that it can select applicants with strong proposals in other focus areas, such as homeland security or narcotics. The district court offered no basis whatsoever for its belief that the illegal immigration focus area, unlike every other, is not compatible with a philosophy of community-oriented policing. Similarly, in exercising its broad discretion, the COPS Office is not compelled to disregard the degree to which local jurisdictions provide basic cooperation to federal officials in removing from the community aliens who have committed crimes. The COPS Office was well within its discretion to determine that reducing recidivism is an important law enforcement priority that can be well served though a community-oriented policing strategy. The district court's conclusion that the scoring factors were arbitrary and capricious rests on the same mistaken premises as its statutory analysis, and ignores the common-sense reasoning that underlies the Department's determination.

**B.** The district court's Spending Clause ruling misapprehends the constitutional limits on federal government grant authority. If, as is the case, the Department acted within its statutory authority in including the challenged provisions, the Constitution offers no basis for setting the provisions aside. Congress is not required to authorize every provision in federal grant programs with a "clear statement." On the contrary, Congress frequently delegates discretionary authority over distribution of federal funds in Spending Clause legislation to executive branch

14

agencies without raising constitutional concerns. There is no requirement that Congress spell out every potential restriction on the use of those funds, so long as it has indicated an intent to restrain their use and delegated authority to an agency to set appropriate criteria. *See, e.g.*, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669, 672 (1985).

The district court erred in invoking *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), ER 5, in which the Supreme Court required a "clear statement" from Congress before it would assume that Congress intended to "alter the usual constitutional balance between the States and the Federal Government." Nothing about that "constitutional balance" is at stake here, and the district court was simply wrong to state that the scoring factors "requir[e] state and local participation in a historically federal function." ER 6. The scoring factors envision only forms of cooperation with federal immigration enforcement already permitted by the INA and the Constitution. They do not override any local law, and localities are free to choose any of the other focus areas, decline to qualify for the bonus points, or refuse to apply for CHP funds in the first place.

## STANDARD OF REVIEW

The district court's grant of summary judgment, including its underlying legal conclusions, is reviewed de novo. *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017).

## ARGUMENT

I.    **The Challenged Provisions are Permissible Considerations in Evaluating Applications for a Competitive Federal Law Enforcement Grant Program**

**A.** Under the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. I, § 10003(a), 108 Stat. at 1808, the Department of Justice is charged with administering law enforcement grant programs related to public safety and community-oriented policing, including the COPS Hiring Program (CHP), which is designed to provide localities with funds to hire or rehire law enforcement officers "for deployment in community-oriented policing."

The COPS Office must exercise significant discretion in administering the CHP, as many agencies can and must do when they receive grant appropriations with broad statutory language. As with many such grants, the governing statute provides minimal guidance for distributing funds beyond requirements that are chiefly aimed at ensuring a broad geographic distribution of funds. Because the broad statutory language constitutes a grant of discretion to the agency, and because the number of grant proposals that satisfy the statute's eligibility criteria generally exceed the federal funds available, the Department can and must establish priorities for evaluating grant applications. In doing so, the Department considers the specifics of each proposal as they relate to the broad goals of community-oriented policing. The COPS Office has explained that community-oriented policing reflects a "philosophy" of policing that "support[s] the systematic use of partnerships and problem-solving techniques to

16

proactively address the immediate conditions that give rise to public safety issues."
ER 53.[2]

The statute itself reflects the broad nature of community-oriented policing as a philosophy of law enforcement that can be applied in virtually all law-enforcement areas, including homeland security. Section 10381(b) provides an expansive list of purposes for which COPS grants may be used to increase the application of community-oriented policing strategies, including "pay[ing] for officers hired to perform intelligence, anti-terror, or homeland security duties." 34 U.S.C. § 10381(b)(4). For this area, like all the others in § 10381(b), Congress required applicants to "explain how the grant will be utilized to reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing," *id.* § 10382(c)(10). Congress thus recognized that homeland security concerns, including immigration, can be addressed through community-oriented policing. Similarly, the Department is instructed to consider the extent to which applicants have "identif[ied] related governmental and community initiatives which complement or will be coordinated

---

[2] The statute does not define community-oriented policing, but the concept is generally a broad one, as noted in the House Report accompanying the legislation. *See* H.R. Rep. 103-324 at 8-9 (1993) ("anticipat[ing] and prevent[ing] crime by use of community-oriented, problem solving techniques" and "tailoring solutions, based on thoughtful, in-depth analysis, to unique neighborhood crime and disorder problems").

with the proposal," *id.* § 10382(c)(4), which would include cooperation with federal immigration enforcement.

In fulfilling its responsibility to determine which community-oriented policing programs most deserve federal funding, the COPS Office has for many years used a point system to assess applications. The COPS Office scores applicants based on the quality of their community policing plans, ER 21, ¶ 16, and also awards additional points for a range of other factors. For example, the Office awards additional points to jurisdictions with high crime rates, and to jurisdictions that have experienced a "catastrophic event" such as a terrorist attack or mass shooting. *Id.* Since the FY 2011 grant cycle, the Department has also assigned extra points to jurisdictions that design their community-oriented policing programs to fit into one of a number of designated "focus areas" that reflect the Department's law enforcement priorities. ER 18, ¶ 7; ER 22, ¶ 18. In FY 2015, for example, the Department awarded additional consideration to applicants who chose "Building Trust," "Homeland Security," "Homicide and Gun Violence," and "School Resource Officers" as their focus areas. *See* FY 2015 Award Methodology at 1-2.[3]

There should be no serious dispute that the COPS Office is entitled to set priorities in this fashion. Congress has not allocated sufficient funding for all eligible applicants, nor has Congress provided direction sufficient to select the applicants who

---

[3] https://cops.usdoj.gov/pdf/2015AwardDocs/chp/2015-CHP-Methodology.pdf

will receive funding. Instead, Congress has delegated broad authority to the Department to establish the contours of the CHP. As the Supreme Court has explained, "[t]he power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy . . . to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 (1974). And, as is the case here, the gaps left to the filled in many grant programs can be broad—as they are often established by sparse statutes or no more than a few words in an appropriations line item—but such broad grants of policymaking authority to agencies are common and permissible. *See Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 474-75 (2001) ("[W]e have 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'") (quoting *Mistretta v. United States*, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting)).

The COPS Office has made Congress aware of its priorities in evaluating applications, including its established practice of giving special consideration to applications that focus on law enforcement areas of particular concern to the federal government. *See, e.g.*, FY 2017 Performance Budget, Office of Community Oriented Policing Services, at 3 (noting the COPS Office's practice of having grantees select "problem/priority area(s) on which their COPS-funded community policing officers

will be focused").[4]  Congress has annually appropriated money for the CHP and has never suggested that the grant evaluation process departs from the statutory framework.

**B.**  Congress has clearly identified controlling illegal immigration and removing aliens who commit crimes as important federal law enforcement priorities.  *See Demore v. Kim*, 538 U.S. 510, 517-19 (2003); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 846-47 (2018).  Accordingly, as with other important federal law enforcement priorities, the COPS Office has included illegal immigration as one of several focus areas, and has also announced that it would assign extra points to applicants that cooperate with the federal government in particular ways to facilitate the removal of criminals.

Of course, any applicant, including applicants that seek funding for an application in the Illegal Immigration area, must provide an eligible community-oriented policing plan, and use the funds for purposes permissible under the statute. There can therefore be no dispute that the COPS Office is distributing funds in a manner contemplated by Congress.  Thus, the only issue in this case is whether the district court properly held that the COPS Office's discretion in selecting among eligible applicants does not include consideration of an applicant's cooperation with federal immigration enforcement efforts.

---

[4] https://www.justice.gov/jmd/file/821491/download.

It should be beyond dispute that the Department can consider contributions to immigration enforcement efforts in connection with these law enforcement grants. Particularly in light of the high rate of recidivism among criminal aliens, consideration of coordination with federal immigration authorities who seek to detain criminal aliens instead of allowing them to return to the community is plainly consonant with a program designed "to increase police presence, to expand and improve cooperation efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety." Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. I, § 10003(a), 108 Stat. at 1808. And Congress specified that applicants must "identify related governmental and community initiatives which complement or will be coordinated with the proposal." 34 U.S.C. § 10382(c)(4). If an applicant identifies immigration enforcement as an initiative with which it is coordinating, the COPS Office is entitled to consider that statutory factor.

**C.** Los Angeles nevertheless challenges the inclusion of illegal immigration as a focus area, as well as the award of extra points to jurisdictions that cooperate with the federal government's efforts to take custody of aliens subject to removal proceedings upon their release from jail. The City did not challenge the use of other focus areas, and it has not suggested that the Department is generally barred from giving special consideration to grant proposals in certain areas.

21

The district court offered no sound basis for singling out illegal immigration as an impermissible focus area. As an initial matter, the court plainly erred in stating that the inclusion of certain considerations in 34 U.S.C. § 10381(c) precluded the Department from establishing additional priorities. The court declared that "the enumeration of discretionary factors in this context must be read to exclude others," and that reading the statute to authorize the Attorney General to consider additional factors "renders subsection (c) superfluous." ER 6-7. Taken at face value, this reasoning would appear to set aside the longstanding scoring system and would leave the agency *no* mechanism for selecting among eligible applicants. Section 10381(c) simply prioritizes jurisdictions that provide greater than 25% matching funds, 34 U.S.C. § 10381(c)(1), or that have certain laws related to human trafficking, *id.* § 10381(c)(2)-(3). These considerations alone would not be sufficient to allocate the limited CHP funding among applicants in a meaningful way, and limiting the agency to these considerations would in no respect further Congress's purpose in creating the program.

Further, Section 10381(c)(2) and (3) were not added to the statute until 2015. *See* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, tit. VI, § 601, 129 Stat. 227, 259. Under the district court's reasoning, these additions had the effect of eliminating the COPS Office's 20-year practice for scoring CHP applications. Presumably, if Congress meant to eliminate a practice an agency had engaged in for 20 years, it would have used statutory language more clear than "the Attorney General

22

may give preferential consideration, where feasible" to the considerations described in Section 10381(c). *See Whitman*, 531 U.S. at 468 ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

Indeed, the district court itself recognized that it could not properly invalidate the challenged provisions on this basis, acknowledging that the COPS Office has the authority to select "applicants with programs that best embody the statutory purpose of the CHP grant." ER 7. The court nevertheless proceeded to hold that the Department could not award extra points to grant applications in the illegal immigration area.

The court's reasoning fundamentally misunderstands the means by which the COPS Office assesses grant applications. The district court noted that, in the section of the statute specifying the required contents of an application, Congress specified that "applicants must 'explain how the grant will be utilized to reorient the [applicant's] mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing.'" ER 7 (quoting 34 U.S.C. § 10382(c)(10)) (brackets in original). The court then declared that the immigration focus area does not advance community policing goals, apparently believing that the focus area did not require a connection to community policing (as distinct from "policing generally") and implied "limitless discretion to select grant awardees in ways not even tangentially related to community policing." ER 8.

23

This conclusion is inconsistent with the statute, which recognizes that the philosophy of community-oriented policing can be applied across a host of areas, including to homeland security concerns like immigration. Section 10381(b) demonstrates Congress's belief that deploying officers in "intelligence, anti-terror, or homeland security duties," 34 U.S.C. § 10381(b)(4), is a purpose that can be served by community-oriented policing strategies, and Congress mandated that applicants for funds under § 10381(b) demonstrate that they will use the money for purposes of "community-oriented policing," *id.* § 10382(c)(10). Consistent with this statutory command, all CHP grant applications, regardless of their focus area, must propose to use the funds for community policing. The focus area merely describes an area in which the community policing efforts will be undertaken, whether it be drug abuse, "Homeland Security Problems," or problems in enforcing the immigration laws. The Illegal Immigration focus area, like other focus areas, encourages localities to use their community policing expertise and knowledge of local conditions to advance proposals for using community policing principles to combat pressing public safety needs identified by the Department. If an applicant chooses this focus area, its proposal— like any other—"must incorporate the principles of community-oriented policing." ER 18, ¶ 7.

The application itself makes this abundantly clear, emphasizing that the "COPS Office grants must be used to initiate or enhance community policing activities" and stating that applications will be reviewed "to ensure that . . . grant-funded officers . . .

will initiate or enhance your agency's capacity to implement community policing strategies and approaches." ER 69. Question 6 asks the applicant to identify the "problem/focus area that will be addressed by the officers requested in this application." ER 70. The application explains that "[i]dentifying the specific problem/focus area and partnerships that your agency plans to focus on is important to ensure that you satisfy the requirements for COPS Office funding under this program" and "to ensure that . . . grant funded officers . . . will initiate or enhance your agency's capacity to implement community policing strategies and approaches." ER 69. Applicants are asked about their consultations with these prospective partners in developing their community policing plan, ER 82, as well as about the level of "community support" for the proposed strategy and the strategy's "impact [on] the other components of the criminal justice system" in the jurisdiction, ER 83.

The 2017 COPS Hiring Program Application Guide elaborates and further makes clear that funds must be used for officers engaged in community-oriented policing in *whatever* focus area the applicant chooses. It explains that in Question 6 the applicant should identify the "community problem/focus area that you wish to address with COPS Office funding" and that "[a]t any time during your award you need to be prepared to demonstrate how the recipient funds were specifically used to enhance or initiate community policing activities according to your community policing strategy." ER 269. The guide likewise describes Illegal Immigration as a potential "focus area of [the applicant's] community policing strategies." ER 270.

25

Indeed, only one of the 30 successful applicants in the group in which Los Angeles's application was considered (large jurisdictions) chose that focus area. ER 26-27, ¶ 31; ER 28, ¶ 35.

The district court was thus quite wrong in its apparent assumption that applications in the illegal immigration focus area need not satisfy the criteria for community-oriented policing that are at the heart of the program: the Department is not statutorily precluded from awarding a grant on the basis of an application that satisfies the criteria for community-oriented policing merely because its proposal has to do with illegal immigration. On the district court's reasoning, can applicants still tailor their plans to use CHP funds to address "Homeland Security Problems," including "addressing threats against facilities" and developing "criminal intelligence capacity"? *See* ER 19, ¶ 8. Can the COPS Office still award points to jurisdictions recovering from a catastrophic events or to jurisdictions with high crime rates? The district court did not say, but it is difficult to posit a cogent *legal* distinction between the Illegal Immigration focus area and any of the others that have long been included, without objection, in the CHP. As a *policy* matter, one focus area might be preferred over another—but that is a question for the policymaking agency, not a federal district court.

In this facial challenge to the application of the scoring system, there is no basis for presuming that the COPS Office will act contrary to its own guidelines and award grants to applicants that do not satisfy the basic requirements of the program.

Instead, the scoring system serves to select among eligible applicants, including those applicants who seek to apply community-oriented policing in connection with immigration enforcement.

    **D.** The district court likewise offered no reason for concluding that no points could be awarded for immigration enforcement cooperation. In distributing scarce federal funds, the Department is not precluded from assigning additional points to jurisdictions that cooperate with, and do not thwart, federal immigration enforcement. The minimal cooperation involved in these circumstances helps to ensure that criminals subject to removal proceedings do not reoffend in the United States. Los Angeles has no basis for insisting that the Department cannot take its *refusal* to provide a basic level of cooperation into account when considering whether to award discretionary federal funds aimed at building *cooperative* relationships in the law enforcement context. The federal government, in awarding law enforcement grants, is not bound to give equal preference to jurisdictions that seek to impair federal law enforcement and jurisdictions that provide a minimal level of cooperation. On the City's theory, the federal government would be unable to consider a jurisdiction's refusal to notify the federal government when it arrests individuals who are subject to federal criminal warrants. Nothing suggests that Congress required the Department to treat applicants that deliberately refuse to provide basic cooperation with federal authorities on par with other applicants when distributing a discretionary law enforcement grant.

27

**E.** The district court's conclusion that the use of the scoring factors did not satisfy the APA rests on an equally infirm foundation. The court provided no authority for the proposition that determinations about how to exercise discretionary grantmaking authority must be accompanied by "findings or data," ER 10, and we are aware of none. So long as a consideration is permitted by Congress, there is no basis for a court to second-guess the Department's exercise of discretion. There is no plausible ground, in particular, for requiring "findings or data" to support the selection of focus areas, which is an inherently policy-based judgment about which areas a federal agency should prioritize.

Even if some further arbitrary and capricious review were warranted, the scoring factors here satisfy that "highly deferential" standard. *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)). Congress established the CHP to promote public safety and community-oriented policing, and thus intended the Department to consider those aims in awarding grants. Facilitating federal access to aliens who have violated immigration law and who have violated, or are suspected of violating, state or local criminal laws promotes these interests. As the Supreme Court has recognized, Congress made substantial reforms to the INA precisely because of concerns that "deportable criminal aliens who remained in the United States often committed more crimes before being removed." *Demore*, 538 U.S. at 518. The Department's rationale for the bonus points scoring factor mirrored this

28

Congressional judgment; as the Department explained, the scoring factor rewards jurisdictions that assist efforts to "remove dangerous criminals from our communities." ER 10.

The district court did not explain its disagreement with this straightforward logic, stating only that the Department had not offered "findings or data" to back up the conclusion. At bottom, the court's APA analysis reflects the same mistaken premises as its statutory analysis. It requires only common sense to recognize that aliens who have been removed cannot reoffend in the United States, and a common-sense explanation is all that is required to establish the "reasonable basis" demanded by the APA. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009). The district court's contrary conclusion improperly "substitute[d] its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## II.  The Challenged Provisions Do Not Implicate Spending Clause Concerns

As we have demonstrated above, the challenged considerations properly implement the grant program and fall within the Department's statutory authority. There is no basis for concluding in such circumstances that the Department has violated Spending Clause principles. In any event, on its own terms, the district court's analysis fundamentally misapprehends relevant doctrine.

29

The district court repeatedly suggested that to pass constitutional muster, scoring factors must be imposed by Congress rather than the Department.  ER 5-6, 9. To the extent that the court meant this as a restatement of its view that the statutory scheme did not authorize the scoring factors, that view was wrong for the reasons already discussed.

To the extent the court believed that Congress was under an obligation to provide a "clear statement" of each and every scoring factor that the Department could consider in implementing the CHP, there is no such rule.  Congress frequently delegates discretionary authority over distribution of federal funds in Spending Clause legislation to executive branch agencies without raising constitutional concerns. Spending Clause constraints operate in part to ensure that federal funds are distributed to recipients that are able "to exercise their choice knowingly, cognizant of the consequences of their participation."  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  As the Supreme Court has held, as long as a statute makes clear that an agency enjoys discretion to set the terms of a funding program, and the agency specifies the criteria to permit localities to make an informed decision, no notice concerns arise.  For example, in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the Supreme Court noted its rejection of a "claim of insufficient notice under *Pennhurst* where [the] statute made it clear that there were some conditions placed on receipt of federal funds," and observed that "Congress need not 'specifically identif[y] and proscrib[e]' each condition in the legislation."  *Id.* at 650 (quoting *Bennett v.*

30

*Kentucky Dep't of Educ.*, 470 U.S. 656, 666 (1985)).  As a result, this Court has correctly observed that so long as Congress has expressed an "*intention to impose a condition*," no notice concerns arise even if the statutory language is "largely indeterminate." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (emphasis in original). The Spending Clause does not obligate Congress to spell out each and every detail attached to federal funds; the relevant question for Spending Clause purposes is simply whether Congress has, through its delegation of authority to an agency, made clear that the agency has the discretion to develop criteria for distribution of the funds.

These principles make clear that the solution to notice concerns is to ensure that the agency provided localities with sufficient notice to ensure that they could "exercise their choice" to apply for or accept funds "knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17; *see Bennett*, 470 U.S. at 669, 672 (observing that "the Federal Government simply could not prospectively resolve every possible ambiguity" in a grant program and advising recipients to seek "clarification" from the administering agency).  The district court did not conclude that it was unclear whether the scoring factors at issue here would be used or what was expected to receive points under each factor, and Los Angeles does not suggest otherwise.  And, as noted, to apply for the grant, the City need not agree to take any action with respect to immigration law.

31

The district court was also wrong to suggest that the scoring factors were insufficiently related to the purposes of the grant program for Spending Clause purposes. ER 9-10. As we have demonstrated, the scoring factors here are sufficiently related to community-oriented policing to qualify as a legitimate exercise of the Department's delegated discretion under the CHP statute. No further showing is required to meet the relatedness standard of the Spending Clause, which requires only "some relationship to the purpose of the federal spending." *Mayweathers*, 314 F.3d at 1067; *see Barbour v. Washington Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004) (noting that the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds").

The district court was equally wrong to suggest that federalism concerns make a clear statement necessary in this context on the theory that the scoring factors "alter the 'usual constitutional balance between the States and the Federal Government.'" *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989)). *Gregory* addressed claims that federal law invalidated a state constitutional provision dictating a retirement age for judges. *Id.* at 455-56. *Gregory* premised its expectation of a clear statement on its concerns about "overrid[ing]" a state constitutional provision that affected not simply "an area traditionally regulated by the States," but "a decision of the most fundamental sort for a sovereign entity." *Id.* at 460.

32

Nothing comparable is at stake here. The scoring factors do not override state and local law in any respect, and there is no question that Spending Clause programs may be used to "induce the States to adopt policies that the Federal Government could not itself impose." *National Fed'n of Indep. Business v. Sebelius*, 567 U.S. 519, 537 (2012). Nor do the scoring factors "requir[e] state and local participation in a historically federal function." ER 6. Localities are under no obligation to choose the Illegal Immigration focus area or attempt to qualify for the bonus points, or even to apply for CHP funds in the first place. Optional scoring factors that reward applicants for providing cooperation they already may provide to federal officials consistent with the INA and the Constitution do not "alter the constitutional balance" at all.

The district court was equally wrong to declare that a clear statement is required because the CHP affects a jurisdiction's "police power." ER 5. Of course, a central purpose of the CHP is to create incentives for jurisdictions to change how they exercise their police power by distributing federal funds to jurisdictions that agree to "reorient" their law enforcement "mission toward community-oriented policing" or to "enhance" their "involvement in or commitment to community-oriented policing." 34 U.S.C. § 10382(c)(10). Despite this fact, the district court did not apply its own purported clear statement rule; to the contrary, the court recognized that the Department must have discretion to consider which applicants "best embody" this statutory purpose, ER 7, even though Congress has not defined community-oriented

33

policing or spelled out a scoring rubric for the Department. The Department's delegated discretion necessarily includes the ability to develop factors, like the ones at issue here, related to the purposes of the CHP; no "clear statement" of those factors in the statute is necessary on the district court's own terms.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

CHAD A. READLER
*Acting Assistant Attorney General*

NICOLA T. HANNA
*United States Attorney*

MARK B. STERN
DANIEL TENNY
KATHERINE TWOMEY ALLEN

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*
*bradley.a.hinshelwood@usdoj.gov*

June 2018

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

*s/ Brad Hinshelwood*
Brad Hinshelwood

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,063 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

**CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2018, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Brad Hinshelwood*
Brad Hinshelwood

**ADDENDUM**

**TABLE OF CONTENTS**

34 U.S.C. § 10381(a)-(c)..................................................................................A1

34 U.S.C. § 10382 ..........................................................................................A5

**34 U.S.C. § 10381(a)-(c). Authority to make public safety and community policing grants**

**(a) Grant authorization**

The Attorney General shall carry out a single grant program under which the Attorney General makes grants to States, units of local government, Indian tribal governments, other public and private entities, and multi-jurisdictional or regional consortia for the purposes described in subsection (b).

**(b) Uses of grant amounts**

The purposes for which grants made under subsection (a) may be made are--

(1) to rehire law enforcement officers who have been laid off as a result of State, tribal, or local budget reductions for deployment in community-oriented policing;

(2) to hire and train new, additional career law enforcement officers for deployment in community-oriented policing across the Nation, including by prioritizing the hiring and training of veterans (as defined in section 101 of Title 38);

(3) to procure equipment, technology, or support systems, or pay overtime, to increase the number of officers deployed in community- oriented policing;

(4) to award grants to pay for offices hired to perform intelligence, anti-terror, or homeland security duties;

(5) to increase the number of law enforcement officers involved in activities that are focused on interaction with members of the community on proactive crime control and prevention by redeploying officers to such activities;

(6) to provide specialized training to law enforcement officers to enhance their conflict resolution, mediation, problem solving, service, and other skills needed to work in partnership with members of the community;

(7) to increase police participation in multidisciplinary early intervention teams;

(8) to develop new technologies, including interoperable communications technologies, modernized criminal record technology, and forensic technology, to assist State, tribal, and local law enforcement agencies in reorienting the emphasis of their activities from reacting to crime to preventing crime and to train law enforcement officers to use such technologies;

(9) to develop and implement innovative programs to permit members of the community to assist State, tribal, and local law enforcement agencies in the prevention of crime in the community, such as a citizens' police academy,

A1

including programs designed to increase the level of access to the criminal justice system enjoyed by victims, witnesses, and ordinary citizens by establishing decentralized satellite offices (including video facilities) of principal criminal courts buildings;

(10) to establish innovative programs to reduce, and keep to a minimum, the amount of time that law enforcement officers must be away from the community while awaiting court appearances;

(11) to establish and implement innovative programs to increase and enhance proactive crime control and prevention programs involving law enforcement officers and young persons in the community;

(12) to establish school-based partnerships between local law enforcement agencies and local school systems by using school resource officers who operate in and around elementary and secondary schools to combat school-related crime and disorder problems, gangs, and drug activities;

(13) to develop and establish new administrative and managerial systems to facilitate the adoption of community-oriented policing as an organization-wide philosophy;

(14) to assist a State or Indian tribe in enforcing a law throughout the State or tribal community that requires that a convicted sex offender register his or her address with a State, tribal, or local law enforcement agency and be subject to criminal prosecution for failure to comply;

(15) to establish, implement, and coordinate crime prevention and control programs (involving law enforcement officers working with community members) with other Federal programs that serve the community and community members to better address the comprehensive needs of the community and its members;

(16) to support the purchase by a law enforcement agency of no more than 1 service weapon per officer, upon hiring for deployment in community-oriented policing or, if necessary, upon existing officers' initial redeployment to community-oriented policing;

(17) to participate in nationally recognized active shooter training programs that offer scenario-based, integrated response courses designed to counter active shooter threats or acts of terrorism against individuals or facilities;

(18) to provide specialized training to law enforcement officers to--

    (A) recognize individuals who have a mental illness; and

    (B) properly interact with individuals who have a mental illness, including strategies for verbal de-escalation of crises;

A2

(19) to establish collaborative programs that enhance the ability of law enforcement agencies to address the mental health, behavioral, and substance abuse problems of individuals encountered by law enforcement officers in the line of duty;

(20) to provide specialized training to corrections officers to recognize individuals who have a mental illness;

(21) to enhance the ability of corrections officers to address the mental health of individuals under the care and custody of jails and prisons, including specialized training and strategies for verbal de-escalation of crises;

(22) to permit tribal governments receiving direct law enforcement services from the Bureau of Indian Affairs to access the program under this section for use in accordance with paragraphs (1) through (21); and

(23) to establish peer mentoring mental health and wellness pilot programs within State, tribal, and local law enforcement agencies.

## (c) Preferential consideration of applications for certain grants

In awarding grants under this subchapter, the Attorney General may give preferential consideration, where feasible, to an application--

(1) for hiring and rehiring additional career law enforcement officers that involves a non-Federal contribution exceeding the 25 percent minimum under subsection (g);

(2) from an applicant in a State that has in effect a law that--

(A) treats a minor who has engaged in, or has attempted to engage in, a commercial sex act as a victim of a severe form of trafficking in persons;

(B) discourages or prohibits the charging or prosecution of an individual described in subparagraph (A) for a prostitution or sex trafficking offense, based on the conduct described in subparagraph (A); and

(C) encourages the diversion of an individual described in subparagraph (A) to appropriate service providers, including child welfare services, victim treatment programs, child advocacy centers, rape crisis centers, or other social services; or

(3) from an applicant in a State that has in effect a law--

(A) that--

    (i) provides a process by which an individual who is a human trafficking survivor can move to vacate any arrest or conviction records for a non-violent offense committed as a direct result of human trafficking, including prostitution or lewdness;

    (ii) establishes a rebuttable presumption that any arrest or conviction of an individual for an offense associated with human trafficking is a result of being trafficked, if the individual--

        (I) is a person granted nonimmigrant status pursuant to section 1101(a)(15)(T)(i) of Title 8;

        (II) is the subject of a certification by the Secretary of Health and Human Services under section 7105(b)(1)(E) of Title 22; or

        (III) has other similar documentation of trafficking, which has been issued by a Federal, State, or local agency; and

    (iii) protects the identity of individuals who are human trafficking survivors in public and court records; and

(B) that does not require an individual who is a human trafficking survivor to provide official documentation as described in subclause (I), (II), or (III) of subparagraph (A)(ii) in order to receive protection under the law.

A4

**34 U.S.C. § 10382. Applications**

**(a) In General**

In awarding grants under this be made under this subchapter unless an application has been submitted to, and approved by, the Attorney General.

**(b) Application**

An application for a grant under this subchapter shall be submitted in such form, and contain such information, as the Attorney General may prescribe by regulation or guidelines.

**(c) Contents**

In accordance with the regulations or guidelines established by the Attorney General, each application for a grant under this subchapter shall--

(1) include a long-term strategy and detailed implementation plan that reflects consultation with community groups and appropriate private and public agencies;

(2) demonstrate a specific public safety need;

(3) explain the applicant's inability to address the need without Federal assistance;

(4) identify related governmental and community initiatives which complement or will be coordinated with the proposal;

(5) certify that there has been appropriate coordination with all affected agencies;

(6) outline the initial and ongoing level of community support for implementing the proposal including financial and in-kind contributions or other tangible commitments;

(7) specify plans for obtaining necessary support and continuing the proposed program, project, or activity following the conclusion of Federal support;

(8) if the application is for a grant for hiring or rehiring additional career law enforcement officers, specify plans for the assumption by the applicant of a progressively larger share of the cost in the course of time, looking toward the continuation of the increased hiring level using State or local sources of funding following the conclusion of Federal support;

(9) assess the impact, if any, of the increase in police resources on other components of the criminal justice system;

(10) explain how the grant will be utilized to reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing; and

(11) provide assurances that the applicant will, to the extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency.

**(d) Special provisions**

**(1) Small jurisdictions**

Notwithstanding any other provision of this subchapter, in relation to applications under this subchapter of units of local government or law enforcement agencies having jurisdiction over areas with populations of less than 50,000, the Attorney General may waive 1 or more of the requirements of subsection (c) and may otherwise make special provisions to facilitate the expedited submission, processing, and approval of such applications.

**(2) Small grant amount**

Notwithstanding any other provision of this subchapter, in relation to applications under section 10381(b) of this title for grants of less than $1,000,000, the Attorney General may waive 1 or more of the requirements of subsection (c) and may otherwise make special provisions to facilitate the expedited submission, processing, and approval of such applications.