No. 18-55599

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CITY OF LOS ANGELES,

*Plaintiff-Appellee*,

**v.**

JEFFERSON B. SESSIONS III, et al.,

*Defendants-Appellants*.

On Appeal From The United States District Court
For The Central District Of California

## BRIEF OF PLAINTIFF-APPELLEE CITY OF LOS ANGELES

Mitchell A. Kamin
Mónica Ramírez Almadani
Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
(424) 332-4800

David M. Zionts
Ivano M. Ventresca
Benjamin L. Cavataro
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000

Michael N. Feuer
  *City Attorney*
James P. Clark
  *Chief Deputy City Attorney*
Leela A. Kapur
  *Executive Assistant City Attorney*
Valerie L. Flores
  *Managing Senior Assistant City Attorney*
Michael Dundas
  *Deputy City Attorney*
200 North Main Street, City Hall
East Suite 800
Los Angeles, California 90012
(213) 978-8344

*Attorneys for Plaintiff-Appellee City of Los Angeles*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT .........................................................3

ISSUES PRESENTED.............................................................................3

STATUTES AND REGULATIONS INVOLVED ...................................4

STATEMENT OF THE CASE.................................................................4

      A.     Congress's Establishment Of The Community-Oriented
            Policing Services ("COPS") Grant Program To Support The
            Hiring Of Local Officers To Engage in Community-Oriented
            Policing.................................................................................4

      B.     The Justice Department's Attempts To Use Federal Funds As A
            Weapon To Pressure State And Local Governments To
            Participate In Federal Civil Immigration Enforcement........................8

      C.     The City Of Los Angeles' Application Under The COPS Hiring
            Program .............................................................................13

      D.     Procedural History................................................................14

SUMMARY OF THE ARGUMENT .....................................................16

ARGUMENT .......................................................................................23

I.      THE CHALLENGED CONSIDERATIONS ARE ULTRA VIRES............23

      A.     The Justice Department Cannot Use The COPS Grant To
            Pressure State And Local Governments To Change Their
            Unrelated Regulations, Policies, And Practices..................................26

            1.     The Text, Structure, And Express Purpose Of The COPS
                     Statute Foreclose Preferential Treatment For Applicants
                     That Adopt Policies Unrelated To Their Need For, Or
                     Use Of, Grant Funds. ................................................27

2.     Federalism Principles Confirm That The COPS Statute Cannot Be Read To Authorize Preferential Treatment For States And Localities That Align Their Law Enforcement Operations With A Federal Agency's Preferences. ................. 30

3.     Whether A State Or Local Government "Partners" With Federal Civil Immigration Authorities By Acceding To A Federal Agency's Notice And Access Demands Is Not A Valid Consideration In Awarding COPS Grants. ..................... 33

B.    The Justice Department Cannot Divert Funds Away From Community-Oriented Policing To Federal Civil Immigration Enforcement, And Disfavor Communities That Intend to Use COPS Funds to Engage in Community-Oriented Policing. ................ 36

1.     The Justice Department Is Attempting To Use COPS Grants To Fund Activities Such As "Honoring Detainers" And Section 287(g) Agreements, Which Have Nothing To Do With Community-Oriented Policing. ........................... 37

2.     Even As Presented On Appeal, The Illegal Immigration Focus Area Is Ultra Vires. ........................................................ 41

C.    Requiring the Justice Department To Operate Within The Bounds Of The COPS Statute Does Not Deprive It Of All Discretion. .................................................................................. 48

II.    THE CHALLENGED CONSIDERATIONS VIOLATE THE SPENDING CLAUSE. .................................................................. 51

III.   THE CHALLENGED CONSIDERATIONS VIOLATE THE ADMINISTRATIVE PROCEDURE ACT. ................................................. 53

CONCLUSION .................................................................................. 59

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

- ii -

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Am. Petroleum Inst. v. U.S. Envtl. Prot. Agency*,
52 F.3d 1113 (D.C. Cir. 1995)..............................................................29

*Arizona v. United States*,
567 U.S. 387 (2012)....................................................................11, 43

*Az. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*,
273 F.3d 1229 (9th Cir. 2001) ...............................................................54

*Bond v. United States*,
134 S. Ct. 2077 (2014)....................................................................30

*Bullfrog Films, Inc. v. Wick*,
847 F.2d 502 (9th Cir. 1988) .................................................................3

*Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*,
710 F.3d 946 (9th Cir. 2013) ................................................................29

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001)....................................................................46

*City of Arlington v. FCC*,
569 U.S. 290 (2013)....................................................................23

*City of Chicago v. Sessions*,
888 F.3d 272 (7th Cir. 2018) ..........................................................10, 35

*City of Philadelphia v. Sessions*,
2018 WL 2725503 (E.D. Pa. June 6, 2018)....................................................10

*City of Philadelphia v. Sessions*,
280 F. Supp. 3d 579, 642 (E.D. Pa. 2017)....................................................52

*Cty. of Santa Clara v. Trump*,
275 F. Supp. 3d 1196 (N.D. Cal. 2017), *appeal filed* No. 17-17480
(9th Cir. Dec. 14, 2017) ...................................................................9

- iii -

*Ely v. Velde*,
    451 F.2d 1130 (4th Cir. 1971) ............................................................33

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016)........................................................................53

*Genuine Parts Co. v. Envtl. Prot. Agency*,
    890 F.3d 304 (D.C. Cir. 2018)............................................................55

*Genuine Parts Co. v. Envtl. Prot. Agency*,
    890 F.3d 304 (D.C. Cir. 2018)............................................................55

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)............................................................................29

*Fed. Maritime Comm'n v. Seatrain Lines, Inc.*,
    411 U.S. 726 (1973)............................................................................29

*Kingdomware Techs., Inc. v. United States*,
    136 S. Ct. 1969 (2016)..........................................................................3

*Lara-Torres v. Ashcroft*,
    383 F.3d 968 (9th Cir. 2004) ..............................................................42

*Louisiana Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)............................................................................23

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ..............................................................42

*Morales v. Chadbourne*,
    793 F.3d 208 (1st Cir. 2015)...............................................................39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983)..............................................................................58

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018)........................................................................31

*Nat'l Fed. of Indep. Business v. Sebelius*,
    132 S. Ct. 2566 (2012)........................................................................32

*New York v. United States*,
  505 U.S. 144 (1992) ............................................................................51

*Organized Vill. of Kake v. Dep't of Agric.*,
  795 F.3d 956 (9th Cir. 2015) (en banc) ............................................55

*Preston v. Heckler*,
  734 F.2d 1359 (9th Cir. 1984) ............................................................3

*Regents of the Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978) ............................................................................3

*Robbins v. Reagan*,
  780 F.2d 37 (D.C. Cir. 1985) ......................................24, 26, 27, 48

*Sever v. NLRB*,
  231 F.3d 1156 (9th Cir. 2000) ...........................................................53

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001) ...........................................................................31

*United States v. Lopez*,
  514 U.S. 549 (1995) ...........................................................................30

*Va. Dep't of Educ. v. Riley*,
  106 F.3d 559 (4th Cir. 1997) (en banc) .......................................31, 32

*Valle de Sol Inc. v. Whiting*,
  732 F.3d (9th Cir. 2013) ....................................................................43

*Whitman v. Am. Trucking Ass'n*,
  531 U.S. 457 (2001) ...........................................................................47

*Yates v. United States*,
  135 S. Ct. 1074 (2015) .......................................................................46

**STATUTES**

5 U.S.C. § 706(2)(A) ...............................................................................53

8 U.S.C. § 1357(g) ............................................................................passim

34 U.S.C. § 10152 ...................................................................................9

34 U.S.C. § 10228(a) .........................................................................32, 33

34 U.S.C. § 10381(b) ........................................................................passim

34 U.S.C. § 10382(c)(2), (3), (10) .................................6, 7, 27, 47, 49, 50

42 U.S.C. § 3766(a) ..................................................................................33

Interstate Agreement on Detainers Act, Pub. L. No. 91-538, 84 Stat.
    1397 (1970).........................................................................................50

Pub. L. 103-322, tit. I, § 10002, 108 Stat. 1796, 1807 (codified at 34
    U.S.C. § 10381 note) ...................................... 5, 16, 24, 27, 38, 42, 51

**INTRODUCTION**

Congress directed the U.S. Department of Justice to administer a grant program to support the hiring of officers for deployment in community-oriented policing (the "COPS Hiring Program"). The agency, however, seeks to wield that grant program as a weapon to pressure States and local governments to adopt the Administration's preferred approach to civil immigration enforcement. Communities that are unwilling to subscribe to the Justice Department's unrelated policy agenda are disfavored in the grant process, risking valuable resources for use in community policing.

Specifically, the Justice Department has announced two grounds for preferential treatment in the competitive COPS grant process. *First*, the agency offers "additional consideration" to applicants that certify they have adopted policies reflecting "Partnership" with federal civil immigration authorities: providing the Department of Homeland Security ("DHS") 48 hours' notice before releasing an alien from custody, and providing it access to detention facilities for the purpose of interviewing individuals DHS believes to be aliens. As the Justice Department's brief reflects, these immigration-related Notice and Access demands have nothing at all to do with the hiring of officers for deployment in community-oriented policing. Congress has recognized that the agency lacks authority to use the COPS grant to encourage such unrelated policy changes, authorizing only one

- 1 -

narrow basis (relating to leniency for human trafficking victims) for doing so. Strikingly, the Justice Department does not dispute that its approach renders a provision of the COPS statute wholly superfluous.

*Second*, the agency offers preferential treatment to applicants who commit to using grant funds to focus on "Illegal Immigration." As the application materials reflect, the Justice Department seeks to fund activities having nothing to do with community policing, such as local law enforcement "honoring detainers" (*i.e.*, requests from the federal government to maintain custody of individuals past their release date to allow DHS to take custody), and entering into agreements where local officers act as immigration officers under the direction of the Attorney General. Again, this consideration has nothing to do with community-oriented policing and contravenes the intent of Congress in enacting the grant program.

As its brief reveals, the Justice Department believes it can use a community-oriented policing grant to extract policy concessions entirely unconnected to—and even in tension with—Congress's express purpose in creating the grant. Today, the grant program Congress created has been hijacked to promote State and local participation in federal civil immigration enforcement. Under the next Attorney General, that policy may be maximal use of capital punishment, or its complete abolition; punitive sentences for marijuana usage, or its legalization; stronger regulation of firearms, or no regulation at all. The Justice Department has never

- 2 -

disputed the seemingly limitless scope of the power it contends Congress delegated in creating a community policing grant program. Congress did not, however, write the agency a blank check. This Court should affirm the injunction entered by the district court, and confirm that a federal agency cannot utterly disregard the authorizing statute under which it acts.

## JURISDICTIONAL STATEMENT

Los Angeles agrees with Defendants' jurisdictional statement.[1]

## ISSUES PRESENTED

In administering a competitive grant that Congress created for the purpose of hiring officers for deployment in community-oriented policing, the Justice Department has decided to grant preferential treatment to States and localities that

---

[1] On appeal, the Justice Department has correctly abandoned the jurisdictional objections it made in the district court. As the district court correctly held, the City has standing to challenge grant scoring factors that unlawfully subject the City to an uneven playing field in the competition for federal funds. *See, e.g.*, *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 507 (9th Cir. 1988); *Preston v. Heckler*, 734 F.2d 1359, 1365 (9th Cir. 1984); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 n.14 (1978). And while the 2017 grant cycle in which these considerations were announced has concluded, the City's claims are capable of repetition in a manner that evades judicial review, given the short timeframe of awarding grants, and the Justice Department's strong commitment to continuing to use unlawful immigration-related considerations. *See Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016); Wright & Miller, Fed. Prac. & Proc. § 3533.8 (3d ed. 1998) (noting the "wide array of circumstances [that] have led courts to deny mootness" as capable of repetition yet evading review, including "disputes over the terms or awards of government contracts or grants [which] often involve short contract periods and repeat bidders").

participate in federal civil immigration enforcement efforts. Specifically, the Justice Department favors applicants that (i) certify the existence of policing reflecting "partnership" with federal civil immigration enforcement in their local detention operations, and (ii) focus their use of grant funds on "Illegal Immigration," including by honoring detainers and participating in section 287(g) agreements (together, the "Challenged Considerations"). The issues presented are:

1.  Whether the Challenged Considerations are *ultra vires*.

2.  Whether the Challenged Considerations violate the Spending Clause.

3.  Whether the decision to adopt the Challenged Considerations was arbitrary and capricious.

## STATUTES AND REGULATIONS INVOLVED

All applicable statutes are contained in the addendum of Defendants' opening brief, or the supplemental addendum to this brief.

## STATEMENT OF THE CASE

### A. Congress's Establishment Of The Community-Oriented Policing Services ("COPS") Grant Program To Support The Hiring Of Local Officers To Engage in Community-Oriented Policing

Congress created the COPS program to fund State and local government efforts to engage in community-oriented policing. In enacting the COPS program, Congress explained that it was "establishing a program of grants and assistance in furtherance of [several] objectives," including to "substantially increase the

- 4 -

number of law enforcement officers interacting directly with members of the community" and to "provide additional and more effective training to law enforcement officers to enhance their problem solving, service, and other skills needed in interacting with members of the community." Pub. L. 103-322, tit. I, § 10002, 108 Stat. 1796, 1807 (codified at 34 U.S.C. § 10381 note).[2] Consistent with those purposes, the COPS Office has understood that community-oriented policing "begins with a commitment to building trust and mutual respect between police and communities." *See* Supplemental Excerpts of Record ("SER") 2.

In the COPS statute, Congress enumerated twenty-three "purposes for which grants . . . may be made." 34 U.S.C. § 10381(b). Those purposes include "to rehire" and "to hire and train new" law enforcement officers "for deployment in community-oriented policing." *Id.* § 10381(b)(1), (2). Congress continually updates the statutory purposes. In 2018, for instance, Congress added "peer mentoring mental health and wellness pilot programs" as a purpose of COPS

---

[2] The remaining two purposes for COPS grants are to "encourage the development and implementation of innovative programs to permit members of the community to assist State, Indian tribal government, and local law enforcement agencies in the prevention of crime in the community" and to "encourage the development of new technologies to assist State, Indian tribal government, and local law enforcement agencies in reorienting the emphasis of their activities from reacting to crime to preventing crime." Pub. L. 103-322, tit. I, § 10002, 108 Stat. at 1807.

grants. *Id.* § 10381(b)(23). Congress has never designated civil immigration enforcement as a purpose for, or permissible use of, COPS funding.

Congress also mandated that applicants comply with several application requirements. Applicants for COPS grants must, among other things, "demonstrate a specific public safety need," "explain [their] inability to address the need without Federal assistance," and "explain how the grant will be utilized to reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing." *Id.* § 10382(c)(2), (3), (10).

The Justice Department administers the COPS grant program through its Office of Community Oriented Policing Services ("COPS Office"). The COPS Office manages several types of COPS programs each year, including the COPS Hiring Program grant, which "provides funding directly to law enforcement agencies to hire and/or rehire career law enforcement officers in an effort to increase their community policing capacity and crime prevention efforts." ER228. Each fiscal year, the COPS Office issues applications for the COPS Hiring Program grant and selects local government awardees to receive funds that can typically be used over a three-year period.

Congress has generally not appropriated sufficient money to fund all of the grant requests the COPS Office receives. ER20 ¶ 12. The COPS Office has

therefore created a scoring system tailored to the statutory purpose of awarding funds to communities that most need federal assistance to engage in community-oriented policing, and have the best plans for promoting that type of police work. Thus, the Office awards points based on criteria falling in three categories: Fiscal Health, Crime, and Community Policing. ER23 ¶ 20. "Community Policing" generally accounts for 50% of the score, "Crime" for 30%, and "Fiscal Health" for 20%. *Id.*

The COPS Office also generally offers "additional consideration"—in the form of extra points under its scoring system—for specified reasons. Applicants are directed to select particular "community policing problems or focus areas" that their proposed program will address, and the Office awards extra points to communities that select a focus area that is prioritized for that year. *See* ER254. Ordinarily, the COPS Office "deliberately avoids telling applicants what to do in a given area, so that applicants can develop their own approaches and tactics based on local conditions and their local law enforcement expertise." ER18 ¶ 8. The COPS Office has also provided extra points under its scoring system to law enforcement agencies affected by catastrophic events, reflecting the heightened law-enforcement needs of such communities. ER22 ¶ 18.

Congress has also authorized one basis for the COPS Office to award preferential consideration that does not relate to an applicant's need for, or use of,

COPS grant funds. Section 10381(c) provides that the Attorney General "may" give an application "preferential consideration" if the applicant is in a State with particular laws granting leniency to human trafficking victims. 34 U.S.C. § 10381(c)(2), (3). The COPS Office, acting on this express authorization, generally provides extra points to applicants in States with these congressionally-favored human trafficking laws. *See* ER254.

### B. The Justice Department's Attempts To Use Federal Funds As A Weapon To Pressure State And Local Governments To Participate In Federal Civil Immigration Enforcement

Just one month after taking office, President Donald J. Trump declared that he would use federal funds as a "weapon" to demand State and local support for his federal civil immigration enforcement policies.[3] To implement this edict, the Department of Justice has attempted to condition States' and localities' receipt of federal grants on enforcement of federal civil immigration law.

On January 25, 2017, President Trump issued Executive Order 13768, directing the Attorney General and Secretary of Homeland Security to withhold federal funds from so-called "Sanctuary Jurisdictions."[4] On November 20, 2017, a

---

[3] Harriet Taylor, "Trump to Fox News: I May Defund California as 'a weapon' to fight illegal immigration," CNBC.com (Feb. 5, 2017), https://tinyurl.com/TaylorCNBC.

[4] The White House Office of the Press Secretary, "Executive Order: Enhancing Public Safety in the Interior of the United States," Whitehouse.gov (January 25,

- 8 -

federal district court permanently enjoined Section 9(a) of the Executive Order
because, among other reasons, the Executive Branch attempted to usurp authority
that belongs to Congress under the Spending Clause, and the order violates both
the constitutional limits on federal spending authority as well as the Tenth
Amendment's prohibition against commandeering local jurisdictions to administer
a federal program. *Cty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal.
2017), *appeal filed*, No. 17-17480 (9th Cir. Dec. 14, 2017).

Next, the Administration targeted federal funding under the Edward Byrne
Memorial Justice Assistance Grants ("Byrne JAG") program. That program
supports local criminal justice efforts through grants to States and localities
awarded through a statutory formula based on population and crime rates. *See* 34
U.S.C. § 10152. Although nothing in the statute permits the agency to add
immigration-related conditions to the grant, Defendant Sessions announced in a
press release that Byrne JAG grants would be awarded only to cities and states that
"allow federal immigration access to detention facilities," and "provide 48 hours'
notice [to federal immigration officers] before they release an illegal alien wanted
by federal authorities." SER12. Again, this effort was rejected, including by the

---

2017), § 9(a), *available at* https://www.whitehouse.gov/presidential-
actions/executive-order-enhancing-public-safety-interior-united-states/.

Seventh Circuit, as an overreach by the Justice Department of its statutory authority. *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018)[5]; *see also City of Philadelphia v. Sessions*, 2018 WL 2725503 (E.D. Pa. June 6, 2018).

Undeterred, the Attorney General turned to the COPS grant to exert pressure on States and local governments to participate in civil immigration enforcement. For the fiscal year ("FY") 2017 application cycle, the COPS Office adopted two immigration-related considerations, giving preferential treatment to applicants that qualified and disfavoring those that did not. *First*, the COPS Office added a focus area called "Illegal Immigration." The Office encouraged applicants to select this focus area by offering extra points in the scoring system. To obtain those points, applicants had to "specify" their "focus on partnering with federal law enforcement to combat illegal immigration through" four types of activities: "information sharing, 287(g) partnerships, task forces and honoring detainers." ER24 ¶ 24[6]

---

[5] The Seventh Circuit granted the government's petition to rehear en banc the district court's grant of nationwide relief and has stayed application of the injunction to grant applicants other than Chicago. *City of Chicago v. Sessions*, No. 17-2991, Dkt. No. 134 (7th Cir. June 26, 2018) (en banc). The en banc Seventh Circuit did not disturb the panel's holding that Chicago was likely to succeed on the merits. Los Angeles' complaint also challenges the Byrne JAG conditions, but that challenge was held in abeyance in light of the *Chicago* injunction. SER106.

[6] A "287(g) partnership" is a carefully limited and regulated statutory authorization by which State and local police officers can act as immigration officers, "subject to the direction and supervision of the Attorney General." *See* 8 U.S.C. § 1357(g)(1), (3); *see generally Arizona v. United States*, 567 U.S. 387, 408-09

Underscoring the importance of those activities, the "application system assigned points for focusing on one of these areas." *Id.*

*Second*, the COPS Office further stated, in the COPS Hiring Program application guide, that "[a]dditional consideration . . . may be given" to "applicants that partner with federal law enforcement to address illegal immigration." ER254-55. The agency offered no additional explanation of this possibility until two months after the due date for grant applications. At that point, the COPS Office informed applicants that this additional consideration would be available for jurisdictions that signed and returned a certification form, titled "Certification of Illegal Immigration Cooperation." ER144.

The "Certification of Illegal Immigration Cooperation" was required to be signed by the jurisdiction's highest-ranking law enforcement official (*e.g.*, police chief) and government executive (*e.g.*, mayor). ER144-47. Those officials were required to certify versions of the requirements that the Justice Department has unlawfully attempted to attach as conditions on Byrne JAG grants. Specifically, an applicant was required to certify that it had implemented, or would implement,

---

(2012). "Honoring detainers," though imprecise in its terminology, refers to DHS's practice of requesting State and local law enforcement to detain individuals who otherwise would be released, so that DHS can decide whether to take custody and then do so. *See* U.S. Immigration and Customs Enforcement, Sample Immigration Detainer, https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

specific "rules, regulations, policies, and/or practices" relating to federal civil

immigration enforcement:

- "The applicant entity and/or its governing body has implemented or, before drawing down grant funds if awarded, will implement rules, regulations, policies, and/or practices that ensure that U.S. Department of Homeland Security ('DHS') personnel have access to any of the governing body's correctional or detention facilities in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or to remain in the United States." (the "Access Requirement")

- "The applicant entity and/or its governing body has implemented or, before drawing down grant funds if awarded, will implement rules, regulations, policies, and/or practices that ensure that any of the governing body's correctional and detention facilities provide advance notice as early as practicable (at least 48 hours, where possible) to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien. This certification does not require holding an alien beyond his or her scheduled time of release." (the "Notice Requirement")

ER147.

The sole explanation for this new form of "additional consideration" was a press statement expressing the view of Defendant Sessions that "[c]ities and states that cooperate with federal law enforcement make all of us safer by helping remove dangerous criminals from our communities," and "jurisdictions with these policies in place should be acknowledged for their commitment to ending violent crime, including violent crime stemming from illegal immigration." SER18. These explanations did not mention anything about community-oriented policing.

- 12 -

This Partnership Consideration (based on compliance with the Notice and Access Requirements), as well as the Illegal Immigration focus area, are the Challenged Considerations at issue in this appeal.

### C.  The City Of Los Angeles' Application Under The COPS Hiring Program

The City of Los Angeles has often applied for COPS funding to support its community-oriented policing programs.  In its FY 2017 COPS Hiring Program application, Los Angeles applied for $3.125 million in funds to support hiring officers for its Community Safety Partnership Program.  SER80.  This Program is a paradigmatic community-oriented policing program.  It operates in selected public housing developments located throughout the Los Angeles area and deploys officers to implement programs for at-risk youth, ensure safe passage on school routes, and build relationships in the communities through neighborhood watch groups, quality of life committees, and citizen-police enforcement teams.  SER70. In its application, Los Angeles identified "Building Trust and Respect" as its focus area.  SER69.

The City did not attempt to create a different program, unrelated to community-oriented policing, in order to select "Illegal Immigration" as its focus area and receive extra points for its application.  In addition to its commitment to using grant funds for the community policing purposes Congress intended, Los Angeles has made a longstanding decision that it can best protect public safety by

- 13 -

not participating in federal civil immigration enforcement. Specifically, Los Angeles has implemented "policies and practices designed to promote the public safety of all Los Angeles residents by engendering cooperation and trust between members of the City's many immigrant communities and law enforcement." SER53 ¶ 4. This includes the Los Angeles Police Department's longstanding policy that "restricts an officer from initiating a police action with the objective of discovering a person's immigration status, and also prohibits arrests based solely on civil immigration status." *Id.* ¶ 3.

Los Angeles also did not submit a signed "Certification of Illegal Immigration Cooperation." Because Los Angeles was unwilling to use a COPS grant in order to "partner with federal law enforcement to address illegal immigration," ER255, or to complete a "Certification of Illegal Immigration Cooperation," the deck was doubly stacked against the City in the competition for COPS funds.

### D. Procedural History

On September 29, 2017, shortly after the COPS Office announced the Partnership Consideration but before it awarded the grants, the City filed a complaint seeking a declaration that the Challenged Considerations were unlawful, and an injunction to block the Justice Department from using the unlawful Challenged Considerations in awarding COPS Hiring Program grants. D. Ct. ECF

Nos. 1, 7.  On November 20, 2017, the Justice Department announced its $98

million in awards under the program.  Its press release said little about the

community policing purposes of these funds, but rather focused on the Challenged

Considerations, including a statement by Defendant Sessions boasting that "80

percent of this year's COPS Hiring Program grantees have agreed to cooperate

with federal immigration authorities in their detention facilities."  SER21.  The

City of Los Angeles did not receive a grant.[7]

On cross-motions for summary judgment, the district court granted partial

summary judgment to the City and issued a permanent injunction blocking the

Justice Department from using the Challenged Considerations in making grant

awards under the COPS Hiring Program.  The district court explained that Los

Angeles was injured by not being able to compete for COPS Hiring Program grants

on an even playing field, and that the end of the 2017 grant cycle did not moot its

---

[7] In the district court, the Justice Department claimed that the Challenged
Considerations did not affect the City's position in the 2017 grant cycle.  The City
argued that this question could not be decided on the current record, but focused on
securing prospective relief to ensure an even, and lawful, playing field for future
grant cycles.  The Justice Department has abandoned its earlier position that the
City's claims were moot.  Although the agency had argued in the district court that
it was speculative whether immigration-related considerations would be used in
future cycles, SER98, it has placed the 2018 COPS Hiring Program "on hold until
further notice" in light of the district court's order, so that it can seek the right to
continue using the considerations.  *See Announcement*, Office of Community
Oriented Police Srvs., https://cops.usdoj.gov/grants (last accessed June 11, 2018).

claims under the capable of repetition yet evading review doctrine, because of the short duration of the annual grant process and the reasonable expectation that the City would suffer similar harms in the future. ER4-5. The court further held that the Justice Department's imposition of the Challenged Considerations was *ultra vires*, violated the Spending Clause, and was arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). Accordingly, the court permanently enjoined the Justice Department from using the Challenged Considerations in administering the COPS Hiring Program grant. ER11.[8]

## SUMMARY OF THE ARGUMENT

I.      The COPS Hiring Program grant is authorized by section 10381(b)(1) and (2), which provides funding for officers for "deployment in community-oriented policing." Congress designed the COPS program to "substantially increase the number of law enforcement officers interacting directly with members of the community" and to "provide additional and more effective training to law enforcement officers to enhance their problem solving, service, and other skills needed in interacting with members of the community." Pub. L. 103-322, tit. I, § 10002, 108 Stat. 1796, 1807. In administering the COPS Hiring Program grant, the Justice Department is required to allocate funding based on considerations

---

[8] This is an appeal from that injunction. Final judgment was not entered because the City's claims relating to the Byrne JAG program have been held in abeyance.

related to these statutory purposes of improving and enhancing local law enforcement collaboration with the community.

Instead, the Justice Department is attempting to use funds Congress designated for community-oriented policing for a purpose Congress never intended: to pressure States and localities into adopting policies to align with the Executive Branch's current civil immigration enforcement policies. Congress did not authorize the agency to administer the COPS grant in this manner, and the Challenged Considerations are therefore *ultra vires*.

A.    1. The Partnership Consideration, consisting of the Notice and Access Requirements, is entirely unrelated to the need for, or use of, COPS funding and is thus foreclosed by the text, structure, and express purpose of the COPS statute. Congress provided the Justice Department with ample authority to establish criteria and priorities for selecting grant awardees related to the statutory purpose of hiring officers for deployment in community-oriented policing. With respect to prioritizing criteria based on factors *unrelated* to the need for, or use of, COPS funding, Congress narrowly limited the agency's authority. In section 10381(c)(2)-(3), Congress permitted the Attorney General to grant "preferential consideration" to applicants in States with certain laws providing leniency to human trafficking victims. The Justice Department does not dispute that its broad understanding of its authority would render subsection (c) entirely superfluous,

which is dispositive in showing that the agency is acting outside its authority here. The only reading of the statute that gives full effect to this language—and thus the only sensible reading—is that the limited delegation in subsection (c), which does not include a preference for jurisdictions adopting immigration-related policies, demonstrates that Congress did not authorize the Justice Department to pressure jurisdictions to change other laws and policies unrelated to the need for, or use of, COPS funds.

2. Adopting the Justice Department's interpretation would also pose serious federalism concerns. The Partnership Consideration uses the leverage of federal funds to pressure States and localities to change their law enforcement detention operations—a core area of sovereignty. Congress should therefore not be lightly presumed to have authorized a federal agency to use its administration of a grant to seek such policy changes, and would have spoken clearly had it intended to. No such clear statement exists in the COPS statute. Moreover, Congress prohibited, in section 10228, the kind of supervision and control over local law enforcement that the Justice Department tries to exercise here.

3. The Partnership Consideration is unrelated to the community-oriented policing purpose of the COPS grant because the Notice and Access Requirements do not concern either the hiring of officers or community policing, let alone the hiring of officers *for* community policing. Indeed, compliance with those

- 18 -

conditions involves no interaction between local law enforcement and members of the community. All that is required from local law enforcement is to submit to certain demands from federal immigration officers. Congress did not intend COPS grants to fund cooperation between *local officers* and *federal immigration agents*. Rather, Congress created the COPS program to fund community-oriented policing, a policing strategy focused on cooperation and collaboration between *local law enforcement* and *the community*. The agency lacks authority to pressure States and localities to adopt Notice and Access policies that are unrelated to the need for, or use of, COPS funds.

B.     The COPS Office also awards extra points to jurisdictions that adopt "Illegal Immigration" as the focus area for their use of grant funds. The Justice Department's brief reflects a new understanding of the focus area as funding any community policing proposal involving illegal immigration. However, the focus area included in the COPS Hiring Program application focused on federal-local partnerships, such as information sharing, 287(g) partnerships, task forces, and honoring detainers. But regardless of whether the focus area is viewed as the COPS Office announced it or as appellate counsel has refashioned it, it is *ultra vires*.

1. The activities that the COPS Office has announced it will fund through the Illegal Immigration focus area have no relationship to community policing.

For example, honoring federal requests to detain an individual past her release date so DHS can assume custody has no relationship to a type of policing that is based on interactions between law enforcement and the community. Equally problematic is the COPS Office's express intention to fund section 287(g) agreements, in which local officers act as immigration officers under the direction and supervision of the Attorney General. *See* 8 U.S.C. § 1357(g). Conducting civil immigration raids under the direction of the Attorney General has nothing to do with community-oriented policing. Further, Congress directed that section 287(g) agreements must be undertaken at the expense of a State or locality; the Justice Department violates this directive by offering to use federal funds to pay for officers in 287(g) agreements. By funding local-*federal* partnerships that are unrelated to community-oriented policing, the Illegal Immigration focus area is *ultra vires*.

2. The same result holds for the revisionist version of the "Illegal Immigration" focus area the Justice Department defends in its brief. There is no statutory authority for the Justice Department to use COPS grants to fund civil immigration enforcement—the COPS statutory framework makes no mention of civil immigration enforcement or immigration generally. The absence of immigration from a statute for community policing grants is hardly surprising, given that States and localities have a limited role to play in federal civil immigration enforcement—an area of law that is unrelated to enforcement of State

and local criminal law. Moreover, the Justice Department never explains how local community-oriented policing could be a viable strategy for federal civil immigration enforcement. Other focus areas for COPS grants are readily addressed by community-oriented policing, such as (in the Homeland Security area) combating the growth of violent extremism by creating stronger bonds between the community and law enforcement, as the COPS Office itself has highlighted. By contrast, entangling local law enforcement with civil immigration enforcement has generally been seen as *antithetical* to community-oriented policing. There is no indication in the statute that Congress intended, *sub silentio*, to fund this entanglement through community policing grants.

C.     Despite the Justice Department's hyperbolic warnings and straw-man arguments, requiring the COPS Office to operate within the statutory limits set by Congress will not deprive the agency of its ability to make discretionary grant decisions. The COPS statute authorizes the agency to rely on an array of considerations related to the use of, and need for, COPS grants. It is the agency's expansive interpretation of its own authority that lacks a limiting principle. If the Justice Department's theory of its own authority is correct, it could use COPS grants to pressure States and localities to engage in any activities that the Department contends would reduce crime. Congress did not intend for a

- 21 -

community policing grant to be wielded by a federal agency to exert such power over local law enforcement.

II.  The Challenged Considerations also violate the relatedness requirement of the Spending Clause.  The Justice Department acknowledges that it cannot constitutionally use scoring considerations for COPS grants if they are unrelated to community-oriented policing.  Yet the agency does not even attempt to argue that the Partnership Consideration has anything to do with *community-oriented* policing; the Justice Department's theory is simply that it helps reduce crime more generally.  Similarly, the activities the COPS Office has announced it will fund under the Illegal Immigration focus area, such as "honoring detainers" and "287(g) partnerships," do not involve community policing, and so have no relationship to the purpose of Congress's spending.

III. Finally, the decision to adopt the Challenged Considerations was arbitrary and capricious under the APA.  Despite relying on factual claims to justify the Challenged Considerations, the Justice Department has refused to consider available, contrary evidence, instead asserting it is making a "common sense" policy judgment.  In justifying the Challenged Considerations, the Justice Department has relied on alleged facts about the dangers of so-called "sanctuary" cities and "violent crime stemming from illegal immigration."  But in making this judgment, the Justice Department has relied on studies whose *authors* have

explained that the Attorney General misrepresented their conclusions. Likewise, the Justice Department argues that the "high rate of criminal alien recidivism" supports the Challenged Considerations. This counterfactual assertion ignores available evidence. Because the Justice Department acted on the basis of political slogans and failed to consider the actual evidence that casts doubt on its factual assumptions, the decision to adopt the Challenged Considerations was arbitrary and capricious.

## ARGUMENT

## I. THE CHALLENGED CONSIDERATIONS ARE ULTRA VIRES.

An agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). The power to spend federal funds, of course, resides with Congress. U.S. Const. art. I, § 8, cl. 1. In 1994, Congress delegated a portion of that authority to the Justice Department, directing the Attorney General of the United States to "make[] grants" to States and local governments "for the purpose[] of" hiring or re-hiring law enforcement officers "for deployment in community-oriented policing." 34 U.S.C. § 10381 (b)(1), (2). The specific purpose of this grant program, as Congress expressly stated, was to "substantially increase the number of law enforcement officers *interacting directly with members of the community*," and to "provide additional

and more effective training to law enforcement officers to enhance their problem solving, service, and other skills needed *in interacting with members of the community*." Pub. L. 103-322, tit. I, § 10002, 108 Stat. 1796, 1807 (emphasis added). Consistent with this codified statutory purpose, the COPS Office agrees that "[c]ommunity policing entails collaborative efforts between law enforcement agencies and the community." ER270.

It should be uncontroversial, then, that the Justice Department must administer this grant program to effectuate the purpose of the grant, *i.e.*, to promote community-oriented policing. "When Congress limits the purpose for which a grant can be made, it can be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985). The Justice Department thus has considerable discretion to allocate grants in the way it reasonably determines will foster a form of policing that relies on collaborative interactions between local law enforcement and the community. Conversely, however, the Justice Department has no authority to use a community-oriented policing grant program as a vehicle to promote its own policy priorities having nothing to do with community-oriented policing.

Yet that is exactly what the Justice Department has done: hijack the COPS program by making grant decisions based on immigration-related considerations that are unrelated to Congress's purpose. *First*, the Justice Department favors applicants that are willing to "partner" with federal civil immigration authorities by adopting law enforcement policies to comply with the federal government's Notice and Access demands. *Second*, the Justice Department favors applicants that agree to "focus" their use of grant funds on federal-local partnerships to participate in civil immigration enforcement.

The Justice Department does not explain how these Challenged Considerations relate to community-oriented policing; instead, it insists that no such relationship is necessary. Indeed, while the Department pays lip service to Congress's purposes of "improv[ing] cooperation efforts between law enforcement agencies and members of the community," *see* DOJ Br. 21 (citation omitted), it brazenly admits that its considerations are "designed" for a wholly different purpose: "to facilitate greater cooperation between localities *and the federal government*," *id.* at 8 (emphasis added). In the Justice Department's view, Congress has written it a blank check, allowing the agency to use COPS funding to promote any law enforcement policy it wishes. The implications of this power-grab are stark: if the Justice Department's interpretation is sustained, in future years that federal agency could unilaterally manipulate the COPS grant program to

- 25 -

favor States that change their death penalty laws, their marijuana laws, their gun laws, and more. Strikingly, although both the City and the district court have pointed this out, *see* ER8; SER95-96; SER104, the Justice Department steadfastly refuses to identify a limit on the power it claims.

But as with any agency, that limit lies in the scope of the delegation from Congress. Here, the Justice Department must allocate funds using "factors solely related to the goal of implementing the stated statutory purpose[]"—the hiring of officers for deployment in community-oriented policing—and not "tak[e] irrelevant or impermissible factors into account." *Robbins*, 780 F.2d at 48. The Challenged Considerations are precisely the type of irrelevant and impermissible factors that Congress has not authorized the Justice Department to use.

### A. The Justice Department Cannot Use The COPS Grant To Pressure State And Local Governments To Change Their Unrelated Regulations, Policies, And Practices.

By favoring applicants that "partner" with federal civil immigration authorities by meeting federal Notice and Access demands, the Justice Department uses funds that Congress reserved for community-oriented policing as a tool to extract State and local policy changes that are wholly untethered from the need for, or use of, those funds. This unauthorized agency action is *ultra vires* and contravenes the separation of powers.

- 26 -

1.    **The Text, Structure, And Express Purpose Of The COPS Statute Foreclose Preferential Treatment For Applicants That Adopt Policies Unrelated To Their Need For, Or Use Of, Grant Funds.**

The statutory text is clear as to the purpose of the grant at issue: to assist States and local communities to hire and rehire law enforcement officers "for deployment in community-oriented policing." 34 U.S.C. § 10381(b)(1), (2); *see also* Pub. L. 103-322, tit. I, § 10002, 108 Stat. at 1807. It is of course correct that the Justice Department can "establish criteria and priorities for evaluating grants competing for limited federal funds." DOJ Br. 11. But it is equally true that these criteria must be "solely related to the goal of implementing the stated statutory purpose[]" of promoting community-oriented policing through the hiring or rehiring of officers. *Robbins*, 780 F.2d at 48.

Congress gave the agency the tools to do exactly that. According to the statute, applicants for a COPS grant must "demonstrate a specific public safety need," "explain the applicant's inability to address the need without Federal assistance," and "explain how the grant will be utilized to reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing." 34 U.S.C. § 10382(c)(2), (3), (10). This statutory framework neatly aligns with the way the Justice Department has historically administered the program: weighing factors related to applicants' needs for the funds and the strength of their proposals to use

- 27 -

those funds for community-oriented policing through the hiring or rehiring of officers.  ER18 ¶ 8.  Although the Justice Department offers hyperbolic warnings that limiting its authority would deprive it of all discretion, DOJ Br. 3, the statute allows ample room for the Justice Department to exercise discretion and judgment *based on the factors Congress determined were relevant* to a grant program focused on promoting community-oriented policing.

Congress has also specifically addressed the treatment of factors *unrelated* to the need for, or use of, grant funds, but instead directed at advancing separate federal priorities.  Under section 10381(c), the Justice Department "may give preferential consideration" to a COPS "applicant in a State that has in effect a law" providing for lenient treatment of human trafficking victims.  *See* 34 U.S.C. § 10381(c)(2)-(3).  For this carefully limited authorization to have any meaning, the agency cannot invent *other* grounds of preferential treatment for applicants that adopt policies favored by the federal agency.  Indeed, under the Justice Department's view, there was no need for Congress to enact subsection (c) at all; the agency already had inherent authority to give preferential treatment to States that adopt favored policies, including laws relating to the treatment of human trafficking victims.

Strikingly, the Justice Department acknowledges—*but does not dispute*—the district court's conclusion that its approach renders § 10381(c) "superfluous."  *See*

- 28 -

DOJ Br. 22. This concession is dispositive. "It is a well-established rule of statutory construction that courts should not interpret statutes in a way that renders a provision superfluous." *Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 966 (9th Cir. 2013). Unlike the Justice Department, the City advances an interpretation that gives effect to every part of the statute: the agency may consider a range of factors relating to the need for a community policing grant and the proposed use of the community policing grant, but it may not favor or disfavor applicants based on whether they adopt unrelated policies, *except* in the one area (human trafficking) that Congress carefully authorized. Limiting the Justice Department's ability to use the COPS grant to push unrelated agendas hardly "leave[s] the agency no mechanism for selecting among eligible applicants." DOJ Br. 22.

The City's interpretation is also compelled by well-established principles of administrative law. Where Congress has granted an agency specific authority in a particular area, courts will not presume that Congress has authorized similar, but broader, powers by implication. *See Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) ("In light of these specific grants of . . . authority, we are unwilling to construe the ambiguous provisions . . . to serve this purpose [of creating further authority]—a purpose for which it obviously was not intended." (quoting *Fed. Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 744 (1973))); *Am.*

- 29 -

*Petroleum Inst. v. U.S. Envtl. Prot. Agency*, 52 F.3d 1113, 1119 (D.C. Cir. 1995)
(agency "cannot rely on its general authority to make rules . . . when a specific
statutory directive defines the relevant functions of [the agency] in a particular
area"). In authorizing the Justice Department to accord preferential consideration
to jurisdictions with certain laws granting leniency to victims of human trafficking,
Congress confirmed the agency's lack of authority to use COPS funding to favor
States and localities that adopt *other* law enforcement policies unrelated to the
need for, or use of, COPS funds. That includes the unrelated policies the Justice
Department is advancing here: supporting "partnership" with federal civil
immigration authorities.

> **2. Federalism Principles Confirm That The COPS Statute Cannot Be Read To Authorize Preferential Treatment For States And Localities That Align Their Law Enforcement Operations With A Federal Agency's Preferences.**

The Justice Department's expansive understanding of its own authority not
only disregards the text, structure, and purpose of the statute, but also creates
serious federalism concerns. The Notice and Access Requirements concern the
way State and local law enforcement manage their detention operations, an aspect
of the police power where "States historically have been sovereign." *United States
v. Lopez*, 514 U.S. 549, 564 (1995). Where the federal government wishes to
intervene in such areas, the Supreme Court requires a clear statement from
Congress to ensure that it "in fact faced, and intended to bring into issue, the

critical matters involved." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991); *Bond v. United States*, 134 S. Ct. 2077, 2089 (2014). This federalism "concern is heightened" where, as here, it is an "administrative interpretation [that] alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001).

Consistent with this rule, courts do not allow agencies to invent their own grant conditions on State and local governments, but require "unambiguous statutory expression of congressional intent to condition the States' receipt of federal funds in a particular manner." *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 566 (4th Cir. 1997) (en banc) (adopting the dissenting panel opinion of Luttig, J.), *superseded by statute*. As the en banc Fourth Circuit explained, the need for clarity from Congress is "especially important" where "the claimed condition requires the surrender of one of . . . the powers or functions reserved to the States by the Tenth Amendment." *Id.* at 566 (discussing education conditions).

Here, State and local law enforcement officers cannot be *ordered* to comply with the Notice and Access Requirements. *See Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018) (explaining that the "anticommandeering doctrine" reflects the Constitution's "decision to withhold from Congress the power to issue orders directly to the States"). The Justice Department is using federal funds to induce

compliance with these federal demands on State and local law enforcement officers. Applying *Riley* and settled federalism-related canons of construction, a federal agency's authority to pressure States in this manner cannot be lightly presumed without a clear delegation of authority from Congress.[9]

Far from expressly authorizing preferential treatment for applicants that "partner" with federal civil immigration authorities in their detention operations, Congress worried that the Justice Department might abuse its grant-making powers to pressure States and local governments to make unrelated law enforcement policy changes. To address this federalism concern, Congress provided that nothing in the Justice Department's grant-making authorities (or any other Act) "shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." 34 U.S.C. § 10228(a). Congress enacted section 10228 to prevent just what the

---

[9] The Justice Department is certainly correct that "Spending Clause programs may be used to 'induce the States to adopt policies that the Federal Government could not itself impose.'" DOJ Br. 33 (quoting *Nat'l Fed. of Indep. Business ("NFIB") v. Sebelius*, 132 S. Ct. 2566, 2579 (2012)). But *NFIB* does not speak generically about "Spending Clause programs"—it says that "*Congress* may offer funds to the States . . . [to] induce the States to adopt policies." *NFIB*, 132 S. Ct. at 2579 (emphasis added). This sleight of hand just highlights the Justice Department's basic error: the policies it is advancing are those *the agency*, not Congress, wishes States and localities to adopt.

Justice Department is attempting to do here: use its administration of grant funds to exercise "control over . . . 'vital matters pertaining to the day-to-day operations of local law enforcement.'" *Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971) (quoting S. Rep. No. 90-1097 at 222 (1968)) (discussing 42 U.S.C. § 3766(a), an earlier version of section 10228(a)).[10]

### 3. Whether A State Or Local Government "Partners" With Federal Civil Immigration Authorities By Acceding To A Federal Agency's Notice And Access Demands Is Not A Valid Consideration In Awarding COPS Grants.

Not once in its brief does the Justice Department posit some connection between the Notice and Access Requirements and the statutory purpose of the grant, *i.e.*, the promotion of community-oriented policing through the hiring or rehiring of officers to be deployed in such efforts. Nor could it. The "partnership" the Justice Department demands in exchange for favorable treatment requires local law enforcement to act at the behest of *federal* immigration officers performing

---

[10] Members of Congress stressed that they were not only worried about literal mandates on State and local governments, but the use of "federal assistance to state and local law enforcement" as a "vehicle for the imposition of federal guidelines" on such agencies. S. Rep. No. 90-1097, 1968 U.S.C.C.A.N. 2112, 2276 (1968) (views of Senators Dirksen, Hruska, Scott, and Thurmond). The Justice Department, supporting an earlier version, agreed that it would violate both "the mandate and spirit" of the provision to withhold funds because police departments were not run "the way the Attorney General says they must" be run. *Controlling Crime Through More Effective Law Enforcement: Hearings Before the Subcomm. on Criminal Laws and Procedure of the S. Comm. on the Judiciary*, 90th Cong. at 100, 384, 497 (1967).

*federal* civil immigration enforcement duties.  For the Notice Requirement, local

law enforcement officers are demanded to notify DHS (upon request) before

releasing an alien; for the Access Requirement, local law enforcement officers are

demanded to allow DHS officers access to local jails to interview individuals

believed to be aliens.  Neither demand contemplates any local law enforcement

interaction with members of the community, let alone in the collaborative manner

intended by Congress.  Nor does either demand relate to the hiring or rehiring of

law enforcement officers.  The Justice Department does not pretend otherwise.

Instead, the Justice Department's defense of the Notice and Access

Requirements is that they "ensure that criminals subject to removal proceedings do

not reoffend in the United States."  DOJ Br. 27; *see also id.* at 14.  The Department

could just as easily say that maximal resort to capital punishment will ensure that

criminals are not able to "reoffend in the United States," and so is related to

community policing.  Whether or not these are reasonable measures to counter

recidivism as a general law enforcement goal,[11] they have nothing at all to do with

---

[11] Although not the main point, it is disturbing (and contrary to fundamental
constitutional principles) that the Justice Department assumes that anyone in police
custody is a "criminal," even if they have not been convicted of anything.
Moreover, the agency's repetition of the political slogan of "criminal alien
recidivism" is arbitrary and contrary to reality.  *See infra* at 56-58.

*community-oriented* policing, a law enforcement philosophy that focuses on improved interactions with the community.

The Justice Department also suggests that because the COPS grant is "aimed at building *cooperative* relationships in the law enforcement context," it may consider the "level of cooperation" that States and local governments provide to federal civil immigration authorities. DOJ Br. 27. But these are wholly distinct types of "cooperation." The purpose of the grant program, as the Department itself acknowledges, is "to expand and improve cooperative efforts between law enforcement agencies *and members of the community*." DOJ Br. 21 (quoting Pub. L. No. 103-322, tit. I, § 10003(a), 108 Stat. at 1808) (emphasis added). Improved cooperation between local law enforcement and the *federal Department of Homeland Security* is something very different, and unrelated to the statutory purpose.

The Justice Department also attempts to minimize its *ultra vires* actions by casting its Notice and Access demands as "minimal" and "basic." DOJ Br. 27. The Seventh Circuit rejected a similar argument concerning the Department's attempt to impose the Notice and Access requirements as conditions on Byrne JAG grants. As the Seventh Circuit found, the Justice Department's position "evinces a disturbing disregard for the separation of powers." *City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018). The Department lacks authority "to condition

- 35 -

the payment of . . . federal funds on adherence to its political priorities," however minimal or "basic" it considers the burden. *Id.* No matter how easy the Justice Department thinks it would be for local communities to enmesh themselves in civil immigration enforcement, the fundamental point remains: the agency is not authorized to use a grant for the hiring of law enforcement officers to engage in community-oriented policing, in order to wrest unrelated policy concessions from States and localities.

    **B.** **The Justice Department Cannot Divert Funds Away From Community-Oriented Policing To Federal Civil Immigration Enforcement, And Disfavor Communities That Intend to Use COPS Funds to Engage in Community-Oriented Policing.**

The Justice Department has also decided to give preferential treatment to grant applicants that are willing to "focus" their federally-funded grant program on "Illegal Immigration." Specifically, as the grant application states, the agency favors applicants who are willing to spend grant funds to "partner[] with federal law enforcement to address illegal immigration [through] information sharing, 287(g) partnerships, task forces and honoring detainers." ER70. In the district court, the Justice Department defended this policy by expansively defining the statutory term "community-oriented policing" to the point of meaninglessness. SER101. On appeal the agency has switched its defense to simply ignore the COPS Office's characterization of the focus area. But whether the Court considers

the actually existing policy or the revisionist version now advanced by counsel, the

Justice Department is acting *ultra vires*.

> **1.    The Justice Department Is Attempting To Use COPS Grants To Fund Activities Such As "Honoring Detainers" And Section 287(g) Agreements, Which Have Nothing To Do With Community-Oriented Policing.**

On appeal, the Justice Department claims that applications selecting the

"Illegal Immigration" focus area must still "propose to use the funds for

community policing."  DOJ Br. 24.  The agency even faults the district court for

"its apparent assumption that applications in the illegal immigration focus area

need not satisfy the criteria for community-oriented policing."  *Id.* at 26.  Yet this

was no "assumption" at all.  In the grant applications it promulgated and the

positions it took in the district court, the Justice Department made clear that it was

indeed favoring applicants based on their willingness to participate in civil

immigration enforcement, without any relationship to community-oriented

policing.

As the agency's own declarant explained, applicants would receive bonus

points under the Illegal Immigration focus area by "partnering with federal law

enforcement to combat illegal immigration through information sharing, 287(g)

partnerships, task forces and honoring detainers."  ER24 ¶ 24.  The COPS Hiring

Program application said the same thing.  *See* ER70.  And in its district court brief,

the Justice Department admitted that an applicant's "willingness to enter into an

agreement under [Section 287(g)] may accord a CHP applicant additional points in the scoring process." SER100 n.8.

None of these activities that the COPS Office expressly committed to funding under the Illegal Immigration focus area involves community-oriented policing, *i.e.*, "law enforcement officers *interacting directly with members of the community*." Pub. L. 103-322, tit. I, § 10002, 108 Stat. at 1807 (emphasis added). Rather, as the Justice Department concedes, "[t]his focus area was designed to facilitate greater cooperation between localities *and the federal government*" to enforce federal civil immigration law. DOJ Br. 8 (emphasis added).

The grant application's reference to "honoring detainers" is illustrative. An "immigration detainer" is a "request[]" from the Department of Homeland Security that a State or local law enforcement agency "maintain custody of [an] alien" for up to 48 hours "beyond the time when he/she would otherwise have been released from [its] custody to allow DHS to assume custody."[12] The Justice Department does not explain how an applicant could "apply community-oriented policing in connection with" detaining individuals on behalf of federal civil immigration authorities. DOJ Br. 27. Indeed, it is hard to see how honoring detainer requests

---

[12] U.S. Immigration and Customs Enforcement, Sample Immigration Detainer, https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

could be done in a way that involves cooperative efforts between law enforcement agencies and members of the community.[13]

The "287(g) partnerships" the Justice Department wishes to fund have no more of a connection to community-oriented policing. An agreement under section 287(g) of the Immigration and Nationality Act ("INA") is between the U.S. Attorney General and a State or political subdivision, and authorizes State or local law enforcement officers "to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States," while acting "subject to the direction and supervision of the Attorney General." 8 U.S.C. § 1357(g). Again, the Justice Department does not and cannot explain how local police officers carrying out civil immigration raids under the control of the Attorney General could "implement community policing strategies." DOJ Br. 25.

This aspect of the "Illegal Immigration" focus area is unlawful for a further, independent reason. Congress mandated that participation in civil immigration enforcement through section 287(g) agreements must be undertaken "at the

---

[13] In fact, "honoring detainers" has led to municipal liability for Fourth Amendment violations. *See, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 215-19 (1st Cir. 2015) (holding that detaining an individual pursuant to an immigration detainer without additional probable cause is a clearly established violation of the Fourth Amendment).

expense of the State or political subdivision." 8 U.S.C. § 1357(g)(1). In addition to flouting the COPS statute, the Justice Department is contravening a clear mandate of the INA: the agency is offering federal funds, through the COPS program, to subsidize State and local participation in immigration enforcement pursuant to section 287(g) agreements, which Congress directed was to be done at State and local expense.[14]

The Justice Department all but admits that the activities it has previously said are covered by the "Illegal Immigration" focus area have nothing to do with community-oriented policing. The agency's brief mentions just once, in passing, in the background section, the types of programs the COPS Office intends to fund under this focus area. DOJ Br. 7-8. The brief makes no argument about the use of grant funds for activities such as honoring detainers and participation in section

---

[14] In the district court, the Justice Department acknowledged that applicants choosing the "Illegal Immigration" focus area could use COPS grant funds "to hire or rehire officers" to participate in civil immigration enforcement pursuant to a Section 287(g) agreement. ER24 ¶ 24 n.2; SER100 n.8. Its sole defense of this was that the salaries of these officers were not an "expense" of a 287(g) agreement. *See id.* The Justice Department has sensibly abandoned that position, as it is contradicted by guidance from the Department of Homeland Security. *See* Draft 287(g) Memorandum of Agreement, https://www.ice.gov/doclib/detention-reform/pdf/287g_moa.pdf ("The [local law enforcement agency] is responsible for personnel expenses, including, but not limited to, salaries and benefits, local transportation, and official issue material."). On appeal, the Justice Department replaces that insubstantial argument with no argument at all for how it can lawfully subsidize section 287(g) agreements through COPS grant funds.

287(g) agreements, despite their centrality to the COPS Office. But however much appellate counsel wishes to avoid addressing the focus area as it actually exists, there is no escaping its focus on "partnering with federal law enforcement to combat illegal immigration through information sharing, 287(g) partnerships, task forces and honoring detainers." ER24 ¶ 24.

There is thus no need to "presume" anything about how "the COPS Office will act" in implementing the Illegal Immigration focus area. DOJ Br. 26. The COPS Office has already admitted the key, and dispositive, fact: the "Illegal Immigration" focus area was adopted to fund federal-local immigration enforcement partnerships that have nothing to do with community-oriented policing. That focus area is therefore *ultra vires*, as is the Justice Department's disfavored treatment for applicants that are not willing to "focus" on federal civil immigration enforcement, but instead wish to use community policing grant funds for community policing programs.

### 2. Even As Presented On Appeal, The Illegal Immigration Focus Area Is Ultra Vires.

As explained above, the Justice Department's main strategy on appeal is to ignore the COPS Office's own description of the "Illegal Immigration" focus area, which makes clear that it is intended to fund programs having no connection to community-oriented policing. Instead, the agency's counsel suggests that the focus area would fund only programs that "seek to apply community-oriented

policing in connection with immigration enforcement." DOJ Br. 27. But even this sanitized version of the focus area would still be *ultra vires*.

Congress made its purpose in enacting the COPS program clear: to "increase the number of law enforcement officers interacting directly with members of the community," specifically so that "members of the community" can assist State and local law enforcement "in the prevention of crime in the community." Pub. L. 103-322, tit. 1, § 10002, 108 Stat. at 1807. As this Court has recognized, "[u]nlawful presence is not criminal," and "detain[ing] individuals solely because of their immigration status" is "a purely civil matter." *Melendres v. Arpaio*, 695 F.3d 990, 1001-02 (9th Cir. 2012); *see also Lara-Torres v. Ashcroft*, 383 F.3d 968, 973 (9th Cir. 2004) (noting that "deportation and removal proceedings are civil"). Congress gave no indication that a grant program related to "prevention of crime in the community" could be repurposed for *civil* immigration enforcement.

The absence of any mention of civil immigration enforcement in the COPS statute confirms that this is not what Congress intended. In enumerating twenty-three permissible purposes for COPS grants, Congress made clear the wide range of topics it considered relevant to a community-oriented policing approach by State and local law enforcement. These areas include crime control, gang activities, drugs, mental illness, and terrorism. *See* 34 U.S.C. § 10381(b)(4), (5), (8), (9), (11), (12), (15), (23). Notably absent from this list is any mention of civil

immigration enforcement. It is not surprising that Congress would exclude civil immigration enforcement in identifying areas where States and localities should be encouraged to implement community policing strategies, given the historically limited role States and local governments are permitted to play in civil immigration enforcement. *See Arizona v. United States*, 567 U.S. 387, 408 (2012) ("Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer."); *Valle de Sol Inc. v. Whiting*, 732 F.3d, 1006, 1023 (9th Cir. 2013) ("[p]ower to regulate immigration is unquestionably exclusive federal power" (quoting *DeCanas v. Bica*, 424 U.S. 351, 354 (1976)).

That community-oriented policing has nothing to do with civil immigration enforcement is apparent from the practice of the COPS Office itself. The Office highlights numerous programs and "success stories" illustrating the ways in which particular local law enforcement problems can be solved using community-oriented policing. For example, the COPS statute contemplates that "homeland security duties" could be performed in a manner that involve community policing. 34 U.S.C. § 10381(b)(4). Consistent with this recognition, the COPS Office devotes a full section of its website to "Homeland Security Through Community Policing." COPS Office, *Homeland Security Through Community Policing*, https://cops.usdoj.gov/Default.asp?Item=2472. It includes a range of practical guidance, programs, and success stories, including "a framework to improve

community engagement, trust, prevention, and intervention regarding individuals at risk for engaging in violent extremism." *Id.*

By contrast, the COPS Office says nothing about how a community might engage in "Civil Immigration Enforcement Through Community Policing."[15] To the contrary, when the COPS Office has addressed the relationship between immigration enforcement and community policing, it has recognized that "uncertainty and concern about local law enforcement's role in immigration" can create an *obstacle* to community policing. SER38 (*Enhancing Community Policing With Immigrant Populations: Recommendations from a Roundtable Meeting of Immigrant Advocates and Law Enforcement Leaders*, COPS Office (2010 summary of Aug. 2008 roundtable)). Thus, the COPS Office does not advertise any "success story" about local police partnering with federal authorities to conduct immigration raids. It does promote the successful use of COPS funds to hire a bilingual officer to "build[]trust between the police and Hispanic community," because "mistrust of the police" in that community caused "crime [to

---

[15] Unsurprisingly, none of the COPS Office's 11 enumerated "Community Policing Topics" relates to civil immigration enforcement. Those topics are: Alternatives to Incarceration, Building Trust, Child and Youth Safety, Community Partnerships, Drugs, Hate Crime Resources, Homeland Security, Officer Safety and Wellness, Organizational Transformation, Problem Solving, and Procedural Justice. COPS Office, *Community Policing Topics*, https://cops.usdoj.gov/Default.asp?Item=2500#cptopics.

be] under reported." Successful Practices & Strategies, Vol. 1, No. 4, https://cops.usdoj.gov/pdf/CPOS/ss/Vol1No4Galax.pdf.

Law enforcement veterans, including the chiefs of police of the country's major cities, have likewise concluded that entangling local law enforcement with federal immigration enforcement "undermines the trust and cooperation with immigrant communities which are essential elements of community oriented policing." *See* SER91. The widespread agreement that local participation in immigration enforcement is *antithetical* to community-oriented policing confirms what is already apparent from the text and structure of the statute: Congress did not intend funds appropriated for community-oriented policing to be used to subsidize State and local participation in civil immigration enforcement.

Rather than offer a theory of how immigration enforcement could employ community policing strategies, the Justice Department identifies two statutory provisions that it claims (for the first time on appeal) justify the "Illegal Immigration" focus area. Neither suffices.

*First*, the Justice Department suggests that the reference in section 10381(b)(4) to "homeland security duties" shows that Congress viewed community policing as a strategy for federal civil immigration enforcement. As an initial matter, the Justice Department has waived this argument by expressly disclaiming any reliance on subsection (b)(4) in relation to the COPS Hiring Program. *See*

SER99; ER17-18 ¶¶ 5, 6 ("Section 10381(b)(3) through (b)(22) . . . do not authorize the COPS Hiring Program.").  But in any event, the COPS Office itself does not view "Illegal Immigration" as a subset of "Homeland Security": it lists "Illegal Immigration" and "Homeland Security Problems" as separate and distinct focus areas.  ER18 ¶ 7; ER70-71.  It would be especially odd to read subsection (b)(4)'s reference to "homeland security duties" as an implicit authorization to fund local officers to participate in immigration enforcement, when the INA *expressly* requires States and local governments to pay their own expenses when authorized to participate in immigration enforcement.  *See* 8 U.S.C. § 1357(g); *see supra* at 39-40.

Adopting the Justice Department's view would also run counter to the principle that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001).  "[H]omeland security duties" is a general phrase that is preceded by two specific types of homeland-security duties: "intelligence" and "anti-terror" duties.  *See* 34 U.S.C. § 10381(b)(4).  Accordingly, "homeland security" must be interpreted to include activities similar to "intelligence" and "anti-terror" duties.  *Yates v. United States*, 135 S. Ct. 1074, 1086 (2015) ("Had Congress intended the latter 'all encompassing' meaning . . . 'it

is hard to see why it would have needed to include the examples at all.'" (citation omitted)).  Indeed, that is precisely how the COPS Office has referred to "homeland security" in the past.  *See supra* at 46.

*Second*, the Justice Department points to the statutory requirement that COPS applicants "identify related governmental and community initiatives which complement or will be coordinated with the proposal," 34 U.S.C. § 10382(c)(4), which the agency asserts "would include cooperation with federal immigration enforcement."  DOJ Br. 17-18.  This general coordination between the community policing proposal and other "initiatives" does not mean the proposal itself no longer has to involve a real community-oriented policing program.  Congress does not "hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).  Considering the complete absence of immigration from the COPS statute, it is untenable to suggest that a mere reference to "related governmental initiatives" authorizes the use of COPS grants to fund State and local participation in civil immigration enforcement.

Because Congress did not intend COPS funding to be used to support civil immigration enforcement, the Illegal Immigration focus area—whether understood as the version adopted by the COPS Office or the counterfactual version described in the Justice Department's brief—is *ultra vires*.

- 47 -

**C.    Requiring the Justice Department To Operate Within The Bounds Of The COPS Statute Does Not Deprive It Of All Discretion.**

Unable to find support for the Challenged Considerations in the COPS statute, the Justice Department invents a straw man and warns of dire consequences.  According to the agency, recognizing any limit on its power would "severely curtail the Department of Justice's longstanding discretion to administer this program" and "would seem to invalidate virtually every other discretionary basis the Department has used to administer this program."  DOJ Br. 3.  This hyperbole is wholly unfounded.

As explained above, the City does not challenge the Justice Department's substantial discretion to award grants—with the critical proviso that it must "make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account."  *Robbins*, 780 F.2d at 48.  As the statute contemplates, the Justice Department may consider a range of factors, and make numerous discretionary judgments, to evaluate applicants' need for, and proposed use of, community policing funds.  *See* 34 U.S.C. § 10381(b)(1)-(23), (c)(1)-(3); *id.* § 10382(c)(1)-(11); *see also supra* at 27-28.  All the City contends is that the agency may not use a community policing grant as a vehicle to pressure communities to make policy changes *unrelated to* their need for or use of grant

- 48 -

funds, or to divert grant funds *away from* community policing toward civil

immigration enforcement activities that have nothing to do with it.

The Justice Department poses a number of rhetorical questions to suggest

that there is no "cogent legal distinction" between the Challenged Considerations

and other factors the COPS Office uses. DOJ Br. 26. But while the Court need not

reach definitive views on considerations that are not (and never have been)

challenged, even a cursory analysis reveals "cogent legal distinctions."

Can the COPS Office award points "to jurisdictions with high crime rates"?

DOJ Br. 26. Yes – the statute specifically contemplates that the agency will

consider the applicant's "public safety need," 34 U.S.C. § 10382(c)(2), to which

crime rates are plainly relevant. Can "applicants still tailor their plans to use CHP

funds to address 'Homeland Security Problems'"? DOJ Br. 26. Yes – Congress

specifically recognizes the role community policing can play in homeland security,

and (unlike civil immigration enforcement) the COPS Office has extensively

documented the ways community policing strategies can be applied to solve

homeland security issues. *See supra* at 43-44. Can the COPS Office award points

to jurisdictions "recovering from a catastrophic events [*sic*]"? DOJ Br. 26. There

is at least a reasonable argument that it can: the COPS Office awards these points

to applicants that have experienced "tragedies or disasters *impacting law*

*enforcement*," ER22 ¶ 18 (emphasis added), which is relevant to the applicant's

- 49 -

public safety need and its "inability to address the need without Federal assistance," 34 U.S.C. § 10382(c)(2), (3), particularly since the applicant might otherwise be required to divert resources away from community policing programs to respond to the catastrophic event.[16]

Ultimately it is the Justice Department's position—not the City's—that has sweeping and remarkable implications. Under its theory, anything the agency contends would "reduce crime" can be appropriately demanded of grant applicants. *E.g.*, DOJ Br. 8. The Justice Department could thus decide that States with the death penalty should be favored because the death penalty deters crime; later the Department could favor States that abolish the death penalty on the ground that *this* is the more sound law enforcement strategy. The Justice Department could give preferential treatment to jurisdictions that relax restrictions on marijuana and guns, or that crack down on marijuana and guns. An administration with different views

---

[16] The Justice Department also worries that "the federal government would be unable to consider a jurisdiction's refusal to notify the federal government when it arrests individuals who are subject to federal criminal warrants." DOJ Br. 27. The Department does not appear to have ever asserted this authority or articulated what its statutory basis would be, and it is not obvious why the Department should have it. Consistent with our system of dual sovereignty, the State and federal governments have established methods of cooperation concerning their overlapping criminal jurisdiction. *See, e.g.*, Interstate Agreement on Detainers Act, Pub. L. No. 91-538, 84 Stat. 1397 (1970).

on immigration could even decide to punish COPS applicants from States that maintain (non-preempted) anti-immigrant laws.

After being challenged numerous times by the City and now the district court, the Justice Department still refuses to identify a State or local law enforcement policy decision it does not believe it can manipulate under the purported authority of a community policing grant. This astonishing power-grab should be rejected.

## II. THE CHALLENGED CONSIDERATIONS VIOLATE THE SPENDING CLAUSE.

The Challenged Considerations also violate the Spending Clause of the Constitution because they bear no reasonable relationship to Congress's purpose for COPS Hiring Program grants.

Conditions on the receipt of federal funds "must . . . bear some relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992). In establishing the COPS grant, Congress clearly articulated its purpose: to "substantially increase the number of law enforcement officers interacting directly with members of the community" and to "provide additional and more effective training to law enforcement officers to enhance their problem solving, service, and other skills needed in interacting with members of the community." Pub. L. No. 103-322, tit. 1, § 10002, 108 Stat. at 1807. The COPS Hiring Program, in particular, is intended to assist States and local governments in

hiring and re-hiring officers "for deployment in community-oriented policing." *Id.*
§ 10381(b)(1), (2). The statute further requires "each application for a grant" to
"explain how the grant will be utilized to reorient the affected law enforcement
agency's mission toward community-oriented policing or enhance its involvement
in or commitment to community-oriented policing." *Id*. § 10382(c)(10).

The Justice Department does not dispute that, to pass constitutional muster
under the Spending Clause, the Challenged Considerations must be "sufficiently
related to community-oriented policing." DOJ Br. 32. The agency baldly asserts
that such a relationship exists, but it does not. Whether a community's regulations,
policies, and practices provide DHS with access to detention facilities, or notice of
a detainee's release time, has no relationship at all to community-oriented policing,
which focuses on developing partnerships and trust between law enforcement and
the community. *See supra* at 33-36; *see also City of Philadelphia v. Sessions*, 280
F. Supp. 3d 579, 642 (E.D. Pa. 2017) ("[T]he argument that enforcement of federal
immigration laws is related to th[e] objective [of enhancing local criminal justice
under the Byrne JAG grant] is unsustainable"). The Justice Department does not
even attempt to explain how the Notice and Access Requirements relate to
community policing, saying only that they "help[] to ensure that criminals subject
to removal proceedings do not reoffend in the United States." DOJ Br. 27.
Whether or not there is any validity to this claim of "criminal alien" recidivism, *see*

*infra* at 53-58, it has absolutely nothing to do with building cooperative relationships between law enforcement and communities.

Similarly, the Illegal Immigration focus area has no connection to community-oriented policing. Contrary to the agency's position on appeal, that focus area is intended to fund activities such as "honoring detainers" and engaging in immigration enforcement under section 287(g) agreements, not community policing programs. *See supra* at 37-41. Moreover, nothing in the statute or the practice of the COPS Office provides any indication that civil immigration enforcement can or should involve community-oriented policing approaches. *See supra* at 41-47.

## III. THE CHALLENGED CONSIDERATIONS VIOLATE THE ADMINISTRATIVE PROCEDURE ACT.

The district court also correctly determined that the Justice Department's decision to use the Challenged Considerations in scoring COPS grants was arbitrary and capricious. 5 U.S.C. § 706(2)(A).

The fundamental requirement the APA imposes on federal agencies is to engage in "reasoned decisionmaking." *Sever v. NLRB*, 231 F.3d 1156, 1164 (9th Cir. 2000). An agency therefore "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citation omitted). In evaluating an arbitrary-and-capricious

challenge, this Court "carefully review[s] the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Az. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (citation omitted). Here, even if the Justice Department theoretically has authority to impose the Challenged Considerations, *but see supra* Parts I, II, the Justice Department has failed to comply with that basic requirement.

The Justice Department argues that it has made an "inherently policy-based judgment about which areas a federal agency should prioritize" based on "common sense." DOJ Br. 28-29. That fundamentally misunderstands the issue. The agency has articulated a *factual* justification for the Challenged Considerations: that they will reduce crime. *See* DOJ Br. 28 (describing the "concerns that 'deportable criminal aliens who remained in the United States often committed more crimes before being removed'" (citation omitted)); *id.* at 29 ("[A]s the Department explained, the scoring factor rewards jurisdictions that assist efforts to 'remove dangerous criminals from our communities.'" (quoting ER10)); *id.* ("It requires only common sense to recognize that aliens who have been removed cannot reoffend in the United States.").

As explained above, the Justice Department lacks statutory authority to consider factors unrelated to community policing simply because it contends they will reduce crime. *See supra* at 23-26, 50-51. But even if it has that authority, the

agency cannot *arbitrarily* conclude that its actions will reduce crime.  And if there is evidence that *contradicts* its assumption, the agency needs to at least consider it. *See Genuine Parts Co. v. Envtl. Prot. Agency*, 890 F.3d 304, 312 (D.C. Cir. 2018) (agency "cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation").  That requirement is all the more important where the evidence is before the agency.  *See Organized Vill. of Kake v. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015) (en banc) ("Agency action is arbitrary and capricious if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency.").

Here, the Justice Department not only ignored evidence, but actually mischaracterized evidence before it in order to fit its political assumptions.  The Attorney General, in announcing the closely-related immigration conditions imposed on the Byrne JAG program, proclaimed that "[s]o-called 'sanctuary' policies make all of us less safe because they intentionally undermine our laws and protect illegal aliens who have committed crimes."  SER12; *see also* SER18 (claiming that city and State cooperation with federal law enforcement "make[s] all of us safer by helping remove dangerous criminals from our communities," including by ending "violent crime stemming from illegal immigration").  In other contexts, the Attorney General invoked a study to support this thesis, but

- 55 -

strikingly, *the authors of that study* have explained that the Attorney General misrepresented its conclusions. *See* SER14.

To the contrary, the study on which the Attorney General relies indicates no such relationship, while other studies show an *inverse* relationship between "sanctuary" policies and crime. *See id*.; SER88. The Justice Department's refusal to consider contrary evidence—and its mischaracterization of available evidence—is arbitrary and capricious.

Similarly, the Justice Department relies in its brief on an alleged "high rate of recividism *[sic]* among criminal aliens." DOJ Br. 21. That is another factual assumption underpinning the agency's action. But the agency offers no support for it, failed to offer any record evidence for this proposition in the district court, and has not addressed the considerable contrary evidence.[17] The notion that "criminal

---

[17] Studies have found that immigrants' "involvement in crime … remains relatively low compared to their second generation immigrant and native-born counterparts," Bianca E. Bersani, *An Examination of First and Second Generation Immigrant Offending Trajectories*, 31 Justice Q. 315, 335 (2014), and that "removable status itself does not emerge as a distinct recidivism risk-marker," Jennifer S. Wong, Laura J. Hickman & Marika Suttorp-Booth, *Examining Recidivism Among Foreign-Born Jail Inmates: Does Immigration Status Make a Difference Over the Long Term?* 16 Global Crime 265, 280-81 (2015) ("The findings do not lend support to the arguments that removable aliens pose a disproportionate risk of repeat involvement in local criminal justice systems."). For example, a Congressional Research Service report found that undocumented immigrants had a recidivism rate of about 17 percent within three years of release. *See Analysis of Data Regarding Certain Individuals Identified Through Secure Communities*,

aliens" are uniquely recidivist may be popular fodder for a campaign speech or a Tweet, but an administrative agency must act on the basis of reasoned decisionmaking, not political sloganeering—and at least consider the evidence that the slogan is wrong.

Even apart from this failure to assess and engage with evidence contrary to its assumptions, the Justice Department's decision is rife with arbitrariness. Throughout its brief, the agency makes the disquieting conflation of "criminal aliens" with any alien in detention or, in fact, any alien who might be subject to removal in civil proceedings. But there is no question that the Challenged Considerations sweep more broadly than that. Participation in civil immigration enforcement under the "Illegal Immigration" focus area, including through section 287(g) agreements, has no necessary connection to criminal law enforcement. And the Partnership Consideration requires Notice and Access concerning those in custody who need not be convicted of any crime; indeed, the Access Requirement

_____

Congressional Res. Serv. (July 27, 2012). A separate Congressional Research Service study found that recidivism in the population more generally could be as high as 67 percent within three years of release. *See Offender Reentry: Correctional Statistics, Reintegration into the Community, and Recidivism*, Congressional Res. Serv. (Jan. 12, 2015). And a former head of Immigration and Customs Enforcement has recognized that recidivism among undocumented immigrants is "pretty modest . . . proportionally as compared with what happens in the criminal justice system in general." Brian Bennett, *Illegal Immigrant Rearrest Rate is 16 Percent, Study Says*, L.A. Times (Aug. 1, 2012) http://articles.latimes.com/2012/aug/01/nation/la-na-illegal-immigrants-20120801.

allows DHS to interview individuals that the federal government merely "believes" to be alien, whether here lawfully or not, and whether convicted of a crime or not. DOJ's unjustified recidivism rationale is a poor fit with the actual reach of the Challenged Considerations.

Finally, the decision to create the Illegal Immigration focus area was arbitrary and capricious for a further reason. Even assuming that the focus area involves some community policing component, *but see supra* at 37-41, and that Congress intended grant funds to be used for community policing strategies to be applied to civil immigration enforcement, *but see supra* at 41-47, the agency would *still* need a reasoned basis for concluding that community policing is a viable strategy for engaging in civil immigration enforcement. The agency has given deep consideration to the ways community policing interacts with other law enforcement issues, such as homeland security, *see supra* at 43-44, but there is no evidence it has ever studied or given any thought to how community policing relates to civil immigration enforcement. Nor has the agency considered the very real possibility, supported by significant evidence, that entangling local law enforcement with federal immigration enforcement *harms* police-community relationships, and is therefore antithetical to the purpose of the COPS grant. *See supra* at 45. The agency's action is thus arbitrary and capricious for the further reason that it "failed to consider an important aspect of the problem." *Motor*

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

## CONCLUSION

The district court's order permanently enjoining the Challenged Considerations should be affirmed.

DATED:     June 29, 2018                    Respectfully submitted,


                                            s/  Michael N. Feuer
                                            Michael N. Feuer
                                                *City Attorney*

Mitchell A. Kamin                           James P. Clark
Mónica Ramírez Almadani                         *Chief Deputy City Attorney*
Neema T. Sahni                              Leela A. Kapur
COVINGTON & BURLING LLP                         *Executive Assistant City*
1999 Avenue of the Stars                        *Attorney*
Los Angeles, California 90067               Valerie L. Flores
(424) 332-4800                                  *Managing Senior Assistant*
                                                *City Attorney*
David M. Zionts                             Michael Dundas
Ivano M. Ventresca                              *Deputy City Attorney*
Benjamin L. Cavataro                        200 North Main Street, City Hall
COVINGTON & BURLING LLP                     East Suite 800
One CityCenter                              Los Angeles, California 90012
850 Tenth Street NW                         (213) 978-8344
Washington, DC 20001
(202) 662-6000
                                            *Attorneys for Plaintiff-Appellee*
                                            *City of Los Angeles*


                                 - 60 -

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiff-Appellee states that it is not aware of any related cases.

   *s/ Michael N. Feuer*     
Michael N. Feuer
*City Attorney*

*Attorney for Plaintiff-Appellee*
*City of Los Angeles*

June 29, 2018

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Circuit Rule 32-1(a) because it contains 13,279 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman and 14 point font.

*s/ Michael N. Feuer*
Michael N. Feuer
*City Attorney*

*Attorney for Plaintiff-Appellee*
*City of Los Angeles*

June 29, 2018

**ADDENDUM**

# TABLE OF CONTENTS

8 U.S.C. § 1357(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

**8 U.S.C. § 1357(g) Performance of immigration officer functions by State officers and employees**

(1) Notwithstanding section 1342 of Title 31, the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

(2) An agreement under this subsection shall require that an officer or employee of a State or political subdivision of a State performing a function under the agreement shall have knowledge of, and adhere to, Federal law relating to the function, and shall contain a written certification that the officers or employees performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws.

(3) In performing a function under this subsection, an officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of the Attorney General.

(4) In performing a function under this subsection, an officer or employee of a State or political subdivision of a State may use Federal property or facilities, as provided in a written agreement between the Attorney General and the State or subdivision.

(5) With respect to each officer or employee of a State or political subdivision who is authorized to perform a function under this subsection, the specific powers and duties that may be, or are required to be, exercised or performed by the individual, the duration of the authority of the individual, and the position of the agency of the Attorney General who is required to supervise and direct the individual, shall be set forth in a written agreement between the Attorney General and the State or political subdivision.

(6) The Attorney General may not accept a service under this subsection if the service will be used to displace any Federal employee.

A-1

(7) Except as provided in paragraph (8), an officer or employee of a State or political subdivision of a State performing functions under this subsection shall not be treated as a Federal employee for any purpose other than for purposes of chapter 81 of Title 5 (relating to compensation for injury) and sections 2671 through 2680 of Title 28 (relating to tort claims).

(8) An officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law.

(9) Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection.

(10) Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State--

(A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or

(B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 29, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/ Michael N. Feuer*
Michael N. Feuer
*City Attorney*

*Attorney for Plaintiff-Appellee*
*City of Los Angeles*

June 29, 2018