**No. 18-55599**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CITY OF LOS ANGELES,

Plaintiff-Appellee,

v.

JEFFERSON B. SESSIONS III, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Central District of California

## REPLY BRIEF FOR APPELLANTS

CHAD A. READLER
  *Acting Assistant Attorney General*

NICOLA T. HANNA
  *United States Attorney*

MARK B. STERN
DANIEL TENNY
KATHERINE TWOMEY ALLEN
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT.............................................1

ARGUMENT ....................................................................................................5

    The Department Acted Well Within Its Authority In Offering
    Applicants Two Additional Means To Obtain Extra Points In The
    Scoring Of Competitive Proposals For Discretionary CHP Grants ....................5

    A.     The City Offers No Basis for Concluding That Including Illegal
          Immigration as a Focus Area Is Facially Invalid ...........................................5

    B.     The City Offers No Basis for Concluding That the Department
          May Not Consider Community-Related Law Enforcement
          Conduct in Awarding Competitive Law Enforcement Grants
          Concerning Community-Oriented Policing.................................................15

    C.     The City's Invocation of the Spending Clause and the
          Administrative Procedure Act Adds Nothing to its Argument...............20

CONCLUSION .......................................................................................... 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Arizona v. United States,*
 567 U.S. 387 (2012) ................................................................................9

*Ely v. Velde,*
 451 F.2d 1130 (4th Cir. 1971) ...............................................................19

*Gregory v. Ashcroft,*
 501 U.S. 452 (1991) ..............................................................................20

*Mayweathers v. Newland,*
 314 F.3d 1062 (9th Cir. 2002) ...............................................................21

*Virginia Dep't of Educ. v. Riley,*
 106 F.3d 559 (4th Cir. 1997) .................................................................20

*Will v. Michigan Dep't of State Police,*
 491 U.S. 58 (1989) ................................................................................20

**Statutes:**

Homeland Security Act of 2002, Pub. L. No. 107-296,
 116 Stat. 2178 .........................................................................................7

Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22,
 129 Stat. 227 .........................................................................................18

Violent Crime Control & Law Enforcement Act of 1994,
 Pub. L. No. 103-322, 108 Stat. 1796 .......................................................6

5 U.S.C. § 553(a)(2) ...................................................................................22

8 U.S.C. § 1357(g) ........................................................................................2

8 U.S.C. § 1357(g)(1) ...........................................................................12, 13

34 U.S.C. § 10228(a) ..................................................................................19

34 U.S.C. § 10381 ................................................................................................19

34 U.S.C. § 10381(b)(4) ...........................................................................2, 7, 11

34 U.S.C. § 10381(c)(2) ......................................................................................18

34 U.S.C. § 10381(c)(3) ......................................................................................18

34 U.S.C. § 10382(c)(4) ...................................................................... 4, 14, 16, 19

34 U.S.C. § 10382(c)(10) ................................................................................ 7, 22

## Regulation:

8 C.F.R. § 287.7(a) .............................................................................................14

## Other Authority:

Office of Cmty. Oriented Policing Servs., U.S. Dep't of Justice,
    *Community Policing Defined* (rev. 2014) .................................................................6

## INTRODUCTION AND SUMMARY OF ARGUMENT

Los Angeles does not contest that the Department of Justice, like any other agency administering a discretionary grant program, has substantial discretion to evaluate and select applicants based on a wide range of broad statutory criteria. The City likewise does not contest that the Department may prioritize certain policy areas of particular importance to the federal government through, for example, the use of focus areas. And the City, like the Department, recognizes that scoring factors involving immigration enforcement are permissible so long as they are related to the purposes of the grant program at issue in this case.

Thus, despite the City's heated rhetoric, this case reduces to one question: whether the immigration-related scoring factors used in the fiscal year 2017 application for COPS Hiring Program (CHP) grants—which are optional for the applicant and are two of many factors used to score applications—are sufficiently related to community-oriented policing. In contending that they are not, Los Angeles relies on an unduly narrow conception of community-oriented policing and a cramped reading of the CHP's authorizing statute. Rewarding jurisdictions that assist in effective enforcement of the immigration laws against aliens who have no lawful right to be present in their community—particularly aliens who present a risk of recidivism against the law-abiding community because they are in local criminal custody—falls well within the Department's broad discretion to select recipients of competitive federal grants supporting community-oriented policing.

First, Los Angeles misunderstands the meaning of community-oriented policing. In the City's view, community-oriented policing occurs only when there is a direct interaction between a law enforcement officer and a community member. Yet community-oriented policing is far broader; it represents a comprehensive philosophy of policing that affects all aspects of a law enforcement agency's efforts by focusing on preventing rather than reacting to crime through engagement with the community. Thus, community-oriented policing includes not only direct police-community interactions, but also action by law enforcement officials made possible by, and informed by, cooperation with local residents. The City is thus quite wrong to declare that immigration enforcement efforts could not "implement community policing strategies," LA Br. 39, just as the arrest of drug dealers and the conduct of anti-drug operations may be the fruit of community policing strategies. Nor can the City explain why a focus on illegal immigration is less susceptible to community-oriented policing than a focus on "addressing threats against facilities" or developing "criminal intelligence capacity," ER 19, ¶ 8, which, as the City does not dispute, are specifically contemplated by the broad authorizations of the governing statute, *see* 34 U.S.C. § 10381(b)(4).

Second, localities can and do play a role in assisting the federal government with enforcement of the immigration laws through programs like Section 287(g) agreements. *See* 8 U.S.C. § 1357(g). Los Angeles presents no reason why localities, in the course of exercising those law enforcement duties, cannot employ the same

2

community-oriented policing strategies that they employ for addressing a host of other public safety concerns. That immigration proceedings are civil in nature is immaterial; whether the goals of community-oriented policing are achieved through civil rather than criminal proceedings has no bearing on the fundamental nature of a community-oriented policing program. Indeed, the fact that localities choose to participate in immigration enforcement efforts is itself a powerful indication that they view those efforts as beneficial for addressing public safety concerns in their own communities, which makes particular sense with respect to enforcement against aliens whom the localities themselves arrested for criminal conduct and thus would pose a threat of recidivism if released back into the community.

The City's arguments with respect to the points awarded for providing a basic level of cooperation with federal immigration officials seeking to detain and remove criminal aliens are equally wide of the mark. Indeed, the City's objection to the Illegal Immigration focus area as civil in nature does not even apply by its terms to the bonus points, which relate only to cooperation with the Department of Homeland Security regarding aliens held in local *criminal* custody. In determining which jurisdictions should receive competitive grants to further community-oriented policing, it is well within the Department of Justice's discretion to prefer jurisdictions that are assisting federal efforts to enforce the immigration laws against removable aliens held in local criminal custody rather than undermining those efforts by returning those individuals to the community where they pose a threat of recidivism,

3

the incidence of which in turn undermines community confidence in, and relationships with, local law enforcement. This modest form of encouragement in no way suggests that Congress issued "a blank check," LA Br. 3, in scoring grants. To the contrary, Congress specifically authorized the Department to reward applications that "identify related governmental and community initiatives which complement or will be coordinated" with a proposal for community-oriented policing funds. 34 U.S.C. § 10382(c)(4). Ensuring that criminal aliens are removed from the country rather than returned to the community to recidivate obviously complements community-oriented policing efforts, especially given that a jurisdiction's choice to assist in such immigration enforcement presumably reflects the wishes of its community. Indeed, Los Angeles concedes that the Department "has considerable discretion" in "reasonably determin[ing]" whether a competitive grant application furthers the purposes of community-oriented policing, LA Br. 24, and that is precisely what the Department has done, notwithstanding the City's disagreement as a policy matter, *see* LA Br. 14.

The City's arguments with respect to the Spending Clause and the Administrative Procedure Act (APA) restate its contention that the Department lacks statutory authority to include the two provisions for obtaining additional points. Los Angeles does not suggest that the provisions violate the Spending Clause if they are authorized by statute. The only question is whether the Department exercised powers conferred by statute, which it did.

4

Similarly, the City's arguments regarding the APA add nothing to its statutory argument, as Los Angeles largely repeats its assertions that immigration enforcement and community-oriented policing are incompatible. These assertions at bottom reflect only policy differences with the federal government. The City is free to select a different focus area. But its view of the best policy furnishes no basis for precluding other jurisdictions with a different view from choosing illegal immigration as a focus for community-oriented policing. Similarly, the Department's judgment that jurisdictions seeking cooperative law enforcement funds should be rewarded for aiding, rather than undermining, federal law enforcement efforts is a policy determination which Los Angeles cannot second-guess through an APA action.

## ARGUMENT

**The Department Acted Well Within Its Authority In Offering Applicants Two Additional Means To Obtain Extra Points In The Scoring Of Competitive Proposals For Discretionary CHP Grants**

### A. The City Offers No Basis for Concluding That Including Illegal Immigration as a Focus Area Is Facially Invalid.

 **1.** Los Angeles does not dispute that in administering a discretionary grant program, the Department of Justice may prioritize certain policy areas of particular importance through the use of focus areas. Its brief provides no basis for concluding that a focus on community-oriented policing designed to address illegal immigration is in any respect outside the Department's statutory authority. And it provides no principled basis for distinguishing this focus area from any of the various others that

5

the Department's Office of Community Oriented Policing Services (COPS) has included throughout the history of these grants.

Immigration, like any number of other law enforcement and public safety concerns, is a potential subject for community-oriented policing. As the City itself recognizes, *see* LA Br. 5 & n.2, the COPS statute explains that the purpose of community-oriented policing is to orient policing towards preventing rather than reacting to crime through engagement with the community. Violent Crime Control & Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. I, § 10002, 108 Stat. 1796, 1807. Likewise, the COPS Office has defined community-oriented policing as a philosophy of policing that embraces "the systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues" across a wide range of areas. ER 53. Rather than narrowly focusing on a single area, police departments who have adopted the philosophy of community-oriented policing employ officers who can "handle multiple responsibilities and take a team approach to collaborative problem solving." Office of Cmty. Oriented Policing Servs., U.S. Dep't of Justice, *Community Policing Defined* 7 (rev. 2014).[1] The philosophy also envisions entering into partnerships and sharing information with a host of entities, including government agencies. *Id.* at 2, 9. The

---

[1] https://go.usa.gov/xUXdk

6

philosophy thus supports engaging with immigration-focused federal agencies and sharing relevant information.

The Illegal Immigration focus area offers localities the opportunity to design plans that put this philosophy to work in the context of illegal immigration. The City identifies no basis for concluding that partnerships and problem-solving techniques cannot be used to proactively address illegal immigration as they are used in addressing other areas of law enforcement concern.

The City does not and cannot contend that illegal immigration is not a proper focus of community-oriented policing merely because it is a matter of national as well as local concern, just like other aspects of homeland security. Los Angeles acknowledges, as it must, that "Congress specifically recognize[d] the role community policing can play in homeland security," LA Br. 49, by explicitly providing that grants for "community-oriented policing," 34 U.S.C. § 10382(c)(10), are properly used to facilitate deployment of officers in "intelligence, anti-terror, or homeland security duties," *id.* § 10381(b)(4).[2]

The City nevertheless argues that immigration—unlike any other area relating to homeland security—is not an area legitimately addressed in community-oriented policing efforts. And, because this is a facial challenge, the City necessarily casts its

---

[2] The functions of the Immigration and Naturalization Service, previously part of the Department of Justice, were transferred to the Department of Homeland Security upon its creation. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 402(3), 441, 116 Stat. 2178, 2192.

argument in absolute terms, asserting that illegal immigration categorically cannot be a subject of community-oriented policing. Los Angeles offers three principal and equally unpersuasive arguments in support of this position.

First, the City advances an untenably narrow notion of community-oriented policing as only the continuous and direct interaction between a law enforcement officer and a community member. Under this theory, whenever direct interaction ceases, so does community-oriented policing. *See* LA Br. 38; *see also id.* at 42. That is, of course, not the case, and the City cannot provide a single citation in support of this notion. The philosophy of community-oriented policing does not anticipate that law enforcement officers will fail to act on the fruits of the cooperative efforts. Nor does it require that a locality deputize community members so that they can take part in raids or arrests.

There is thus absolutely no basis for the City's assertion that an immigration enforcement effort could not "implement community policing strategies." LA Br. 39. Analogously, a police force might work with the community to identify the sources of drug-related crime and to determine which gangs or drug dealers are at the root of the problem. Officers might then consult with members of the community to determine how enforcement efforts might be most effective and least disruptive. But when the police ultimately conduct a targeted raid, they presumably will not involve community members in the operation. Similarly, an operation to enforce the immigration laws

might be made possible by, and its implementation informed by, community input, but community members would not participate in the operation itself.

Second, Los Angeles contends that illegal immigration is a civil rather than a criminal matter, and that it therefore cannot be a subject of community-oriented policing. *See* LA Br. 42. This misses the point. The relevant question is whether an applicant can demonstrate that its plan incorporates the principles of community-oriented policing, not whether the result of community-oriented policing efforts is criminal prosecution. Indeed, the very root of community oriented policing is the notion that local law enforcement will be involved in more than reactive crime fighting—it will be involved throughout the community, through many partnerships, in an effort to build relationships and prevent crime. For example, no one—not even Los Angeles—questions that community-oriented policing may properly be used to address "Traffic/Pedestrian Safety Problems," another focus area in the fiscal year 2017 CHP, without regard for whether issues such as "traffic congestion" are criminal or civil in nature. *See* ER 73-74. Community-oriented policing can be used to resolve both criminal and civil issues that are of concern to a local community and police force. This is especially true where, as here, civil enforcement has a direct relationship to crime, given that illegal immigration and local crime are overlapping and integrated concerns in many communities. *See Arizona v. United States*, 567 U.S. 387, 397-98 (2012). That connection is particularly apparent with respect to those aliens a jurisdiction has already taken into custody for its own *criminal* law enforcement

9

purposes. A comprehensive approach that uses all available tools to combat criminal conduct in a community is entirely consistent with basic principles of community-oriented policing.

Third, Los Angeles advances the equally unfounded contention that the authorizing statute by its terms forecloses the use of community-oriented policing to address concerns stemming from illegal immigration. The City notes that immigration is not specifically mentioned in the statute, LA Br. 42-43, but it does not seriously contend that concerns relating to illegal immigration therefore cannot be the subject of a grant proposal. The statute does not and need not enumerate every area that may be of concern to a community and may also be an area of particular concern to national law enforcement. Los Angeles presumably does not believe that the absence of a specific reference to drugs in the community (a fiscal year 2017 focus area, *see* ER 71), or to addressing issues faced by "children exposed to violence" (a subarea of the fiscal year 2017 "Child and Youth Safety" focus area, *see* ER 70-71), means that Congress did not intend that grant funds be expended on such projects.

In making this textual argument, Los Angeles is also obliged to read illegal immigration out of the areas encompassed by "homeland security," which Congress specified as an area appropriate for community-oriented policing. Los Angeles cannot, of course, suggest that immigration is not a homeland security issue. Instead, it asserts that the Congress implicitly narrowed the normal understanding of "homeland security" because the statute refers to hiring officers "to perform

10

intelligence, anti-terror, or homeland security duties." 34 U.S.C. § 10381(b)(4). *See* LA Br. 46-47. Because "homeland security" is preceded by "intelligence" and "anti-terror," the City reasons, homeland security is a proper subject of community-oriented policing only insofar as it relates to intelligence and anti-terrorism activities.

Los Angeles does not explain how the area of "homeland security," which is referred to in the disjunctive, can properly be read out of the statute in this manner. The City seeks to justify this excision on the ground that the Department's website does not provide an exhaustive list of the ways community-oriented policing can be used to address homeland security concerns. *See* LA Br. 43-44. But the City does not explain how the specificity of the Department's website can be used to alter the text of the statute, particularly in the context of this facial challenge. In any event, the level of detail on the Department's website at a particular time and the fact that the Illegal Immigration focus area was introduced in fiscal year 2017 are of no apparent relevance to the City's statutory argument.

**2.** Los Angeles also advances a narrower version of its facial challenge addressed only to the text of the fiscal year 2017 CHP application, asserting that it references activities that do not involve community-oriented policing. LA Br. 37-39. This argument, too, fails. The Illegal Immigration focus area asked applicants to "specify your focus on partnering with federal law enforcement to combat illegal immigration through information sharing, 287(g) partnerships, task forces and honoring detainers." ER 24. Los Angeles does not even attempt to explain why

"information sharing" or "task forces" cannot employ community-oriented policing strategies. Information sharing is far more effective when there are strong relationships between local police and the community. Similarly, task forces can make their efforts more effective by engaging with the community to target their activities and increase public trust. Presumably Los Angeles does not believe that an applicant in the "Child and Youth Safety" focus area that intended to create a task force to combat the influence of gangs among local youths, *see* ER 71, should be barred from receiving funds on the theory that its activities do not involve community-oriented policing. The City provides no reason to believe that a different result should obtain because the subject matter is illegal immigration rather than gangs.

The City's objection to the application's mention of "287(g) partnerships," ER 70, fails for similar reasons. These agreements, authorized by Section 287(g) of the Immigration and Nationality Act, permit local law enforcement officers to "perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g)(1). The City does not contest that community-oriented policing strategies may be used by law enforcement agencies engaged in investigating crimes or apprehending criminal offenders. There is no reason to presume that, when a law enforcement officer is performing those same functions under a Section 287(g) agreement, the same community-oriented policing techniques cannot be employed. A local law enforcement officer does not stop engaging with the community or enforcing local law when participating in a Section

12

287(g) agreement, and part of the value of a Section 287(g) agreement is that it empowers local law enforcement officers to address a broader range of issues they encounter in their communities. Nothing about a Section 287(g) agreement precludes the application of community-oriented policing principles. That jurisdictions choose to engage in these agreements indicates their desire to encourage immigration enforcement in their communities, even if Los Angeles does not share that desire.

The City contends that providing grant funds to an applicant that participates in a Section 287(g) agreement contravenes Congress's intent that such agreements are carried out "at the expense of the State or political subdivision." 8 U.S.C. § 1357(g)(1); *see* LA Br. 39-40. The City misunderstands the statute. Section 287(g) does not preclude the federal government from subsidizing participation in efforts undertaken pursuant to Section 287(g). The statute simply makes clear that states and localities may not demand reimbursement for expenses associated with their participation. A contrary reading would lead to absurd results. For example, if a jurisdiction used Department grant funds to purchase police equipment (*e.g.*, radios), police officers would have to avoid using that equipment when engaged in efforts undertaken pursuant to Section 287(g). Further, the fact that jurisdictions are willing to expend their own funds under such agreements only underscores that many jurisdictions view combating illegal immigration as having beneficial effects on other law enforcement and public safety concerns in their communities.

13

Los Angeles also suggests that the application's reference to "honoring detainers" is inappropriate. LA Br. 38-39. Detainers, like the other activities listed on the application, operate at the intersection of federal immigration enforcement and local criminal enforcement. An immigration detainer is a device that "serves to advise another law enforcement agency that [the Department of Homeland Security] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). Cooperation with detainers may therefore serve the broader public safety goals identified by a jurisdiction's community-oriented policing proposal, including by ensuring that individuals already held in criminal custody and subject to removal do not reoffend in the community after their release.

Los Angeles underscores the error of its analysis by largely ignoring the Department's statutory authority to consider whether an application "identif[ies] related governmental and community initiatives which complement or will be coordinated" with a proposal for community-oriented policing funds. 34 U.S.C. § 10382(c)(4). As this provision makes clear, once an applicant demonstrates that its proposal incorporates the principles of community-oriented policing, the Department may accord weight to applications demonstrating that a jurisdiction's community-oriented policing efforts will complement other law enforcement initiatives, including federal efforts to enforce the immigration laws. Thus, even if the City were correct that some of the referenced activities are not themselves part of community-oriented

14

policing, they are valid as complementary policies. For example, a jurisdiction's decision to cooperate with detainer requests would further its broader community policing efforts in the Illegal Immigration focus area by ensuring that, once a jurisdiction has taken a removable alien into custody in the course of its community-oriented policing activities, that alien is not returned to the community because of a failure to respond to a detainer.

Finally, even assuming that the premise of the City's argument about the fiscal year 2017 application were correct, it could not support the district court's permanent injunction forbidding the Department from offering the Illegal Immigration focus area at all. The City's narrower argument does not demonstrate that a focus area on illegal immigration is facially invalid. Nor does it show that all of the specific activities mentioned in connection with that focus area on the fiscal year 2017 application are not appropriately subject to community-oriented policing. Thus, if this Court accepts the City's narrower argument, the injunction should be correspondingly narrowed.

**B.    The City Offers No Basis for Concluding That the Department May Not Consider Community-Related Law Enforcement Conduct in Awarding Competitive Law Enforcement Grants Concerning Community-Oriented Policing.**

**1.** Los Angeles recognizes, as it must, that the Department has substantial discretion to set application criteria and to score applications. *See*, *e.g.*, LA Br. 27, 48. In exercising that discretion, the Department can properly give some weight to an applicant's cooperation with federal law enforcement efforts related to community-

15

oriented policing. Indeed, the statute specifically contemplates that the Department will favor applications that identify "related governmental and community initiatives" that will complement the objectives of the program. 34 U.S.C. § 10382(c)(4). The Department's broad discretion in this regard encompasses the bonus points given to jurisdictions that provide access to, and notice of the release dates of, aliens held in local criminal custody.

In determining which jurisdictions should receive competitive grants to further community-oriented policing, it is well within the Department's discretion to prefer jurisdictions that are assisting federal efforts to remove from the community illegal aliens held in local criminal custody, rather than undermining those efforts by returning those individuals to a community in which they have no legal right to reside. The purpose of that cooperation is to ensure that criminal aliens who are held in local criminal custody can be transferred to federal immigration authorities in an orderly manner, and that federal officials have an opportunity to conduct their investigations in a controlled environment that helps keep the community safe. A locality that does not qualify for the bonus points will increase the prevalence of hostile encounters in the local community when federal officials are forced to seek to detain or interrogate aliens on the streets. In addition, cooperation with federal officials helps to ensure that removable individuals held in local criminal custody and of interest to federal immigration officials are not released into the community, thereby reducing the burdens on local communities and law enforcement that result if those individuals

reoffend. Those jurisdictions that choose to provide the forms of cooperation envisioned by the bonus points have determined that they can better foster community confidence in law enforcement and the rule of law by facilitating the removal of criminal aliens, rather than returning them to the community.

The City's argument to the contrary is belied by its acceptance of the bonus points awarded to jurisdictions that have experienced a "catastrophic event." ER 22, ¶ 18; *see* LA Br. 49-50. As the City acknowledges, the Department has broad discretion in assessing CHP applications to consider "public safety need" and the harm created by "divert[ing] resources away from community policing programs to respond" to a catastrophic event. LA Br. 50. It is anomalous to suggest that the Department can consider the increased need for police resources based on circumstances outside the applicant's control, but cannot consider the applicant's own determination to release aliens from local criminal custody directly into the community, thus taxing law enforcement resources in addressing crimes committed by those aliens who reoffend.

The City candidly admits that the COPS Office "has considerable discretion to allocate grants in the way it reasonably determines will foster a form of policing that relies on collaborative interactions between local law enforcement and the community." LA Br. 24. The COPS Office has determined that cooperation in removing criminals from the community is one way to foster better confidence in law enforcement and the rule of law, thereby enhancing community cooperation. Los

17

Angeles has made a different policy determination about how to conduct its law enforcement operations relative to criminal aliens in its community, concluding that ignoring immigration enforcement is more likely to enhance community relationships. *See* LA Br. 14. Regardless of the validity of the City's policy judgment, it may not impose that judgment on the COPS Office, or on other jurisdictions that may make a different policy call. As the City acknowledges, the CHP is designed to enable "law enforcement agencies . . . to increase their community policing capacity and crime prevention efforts." LA Br. 6 (quoting ER 228). Working with federal immigration officials to remove, where appropriate, aliens in local criminal custody complements the goals of community-oriented policing by ensuring that those individuals will not reoffend in the community.

**2.** Los Angeles notes that 34 U.S.C. § 10381(c)(2) and (c)(3) provide that "the Attorney General may give preferential consideration, where feasible," to applicants from states with certain human-trafficking laws. From this specific grant of authority, the City draws the negative inference that the Department generally may not otherwise give preferential consideration to jurisdictions based on their law enforcement practices, such as their cooperation with federal immigration enforcement. LA Br. 28-29. The provisions, enacted as part of a separate piece of legislation to provide assistance to victims of human trafficking, cannot bear the extraordinary weight assigned by the City. *See* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, tit. VI, § 601, 129 Stat. 227, 259. The City mistakenly

18

urges that these provisions would be superfluous if the Department already had authority to give preferred treatment to jurisdictions that had adopted such statutes. LA Br. 28-29. That Congress in separate legislation explicitly sought to encourage the Department to grant such preferences does not demonstrate a congressional judgment that authority would otherwise have been absent, and it says nothing at all about the understanding of the Congress that enacted 34 U.S.C. § 10381.

The City's reliance on 34 U.S.C. § 10228(a) is similarly misplaced. That provision states that the Department may not, through its grants, "exercise any direction, supervision, or control over any police force . . . of any State or political subdivision thereof." *Id.*; *see* LA Br. 32. *All* scoring considerations encourage an applicant's police force to take or refrain from taking certain actions, and Congress expressly contemplated that the Department of Justice could take account of partnerships with other entities such as the federal government. *See* 34 U.S.C. § 10382(c)(4). As described in the very case on which Los Angeles relies, the purpose of § 10228(a) was much more modest: to avoid "the establishment of a federal police force" by allowing federal authorities to control the "routine operations of local police forces," such as by "prescribing the type of shoes and uniforms to be worn" or "the type or brand of ammunition to be purchased." *Ely v. Velde*, 451 F.2d 1130, 1136-37 (4th Cir. 1971) (quotation marks and brackets omitted). Awarding additional consideration to states and localities that provide basic cooperation with federal authorities does not remotely implicate these concerns.

19

Finally, Los Angeles urges that absent a specific authorization, federalism-related canons of interpretation preclude the Department from awarding bonus points for law enforcement cooperation. *See* LA Br. 30-31. But the City does not explain how the bonus points "alter the 'usual constitutional balance between the States and the Federal Government,'" *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989)), or require the "surrender" of "powers or functions reserved to the States," *Virginia Dep't of Educ. v. Riley*, 106 F.3d 559, 566 (4th Cir. 1997) (en banc). At issue here are bonus points awarded in the scoring of a discretionary law enforcement grant. Seeking the bonus points is optional, and, notwithstanding the City's rhetoric, declining to seek the points does not preclude an applicant from receiving a CHP grant. Indeed, the top-scoring jurisdiction in the City's category, like several other funded jurisdictions, did not receive the bonus points. *See* ER 193. And Los Angeles makes no attempt to reconcile its rhetoric of "surrender" with the relatively small size of the grants at issue.

### C. The City's Invocation of the Spending Clause and the Administrative Procedure Act Adds Nothing to its Argument.

The City's contentions with regard to the Spending Clause and the Administrative Procedure Act restate its statutory arguments and fail for the same reasons. Los Angeles does not contend that the two provisions for obtaining additional points violate the Spending Clause if they were, as we have shown,

20

authorized by Congress. Similarly, the arguments regarding the reasonableness of the conditions are premised on the Department's asserted want of authority.

**1.** Los Angeles appears to agree that the Spending Clause has no independent analytic role in this case; its discussion of Spending Clause principles largely incorporates by reference its statutory argument that community-oriented policing cannot be used to address local concerns connected to illegal immigration. *See* LA Br. 52-53. There is no dispute that, in the context of a law enforcement grant, Congress is entitled to give preferential treatment to jurisdictions with law enforcement programs that do not interfere with federal law enforcement. *See Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (conditions on spending need only bear "some relationship to the purpose of the federal spending"). The question is simply whether the Department acted within its statutorily delegated discretion in offering the Illegal Immigration focus area and the bonus points: for the reasons already discussed, the answer is yes.

**2.** The City's Administrative Procedure Act (APA) argument is likewise beside the point. Los Angeles's primary complaint under the APA is identical to its statutory argument: that community-oriented policing and immigration enforcement are incompatible. For example, in urging that the Illegal Immigration focus area is impermissible, the City argues that the Department lacks "a reasoned basis for concluding that community policing is a viable strategy for engaging in civil

immigration enforcement," LA Br. 58, and cites various evidence that, in its view, demonstrates the correctness of its preferred policy, *see id.* at 54-58.

As explained, however, the statutory scheme confirms that immigration, like other law enforcement issues, can be addressed through community-oriented policing. Thus, the decision at issue is the Department's choice to offer jurisdictions the option to advance proposals in the Illegal Immigration focus area. As to this decision, the City's asserted evidence is simply irrelevant. The Department is under no obligation to examine studies to determine whether immigration enforcement always and everywhere has a positive or negative effect on "police-community relationships." LA Br. 58. Instead, the Department's charge is to review a particular jurisdiction's application, examining whether and how effectively a particular jurisdiction's proposal reorients or enhances its "involvement in or commitment to community-oriented policing." 34 U.S.C. § 10382(c)(10).

Jurisdictions that share the City's view need not choose the Illegal Immigration focus area. But Los Angeles cannot use the APA as a vehicle for imposing its policy judgments about the relationship between immigration enforcement and community-oriented policing on other localities that have different views based on the needs of their communities. And determinations about whether grant funds are best spent in this area or some other are highly discretionary and based on normative assessments rather than empirical predictions. *Cf.* 5 U.S.C. § 553(a)(2) (exempting grants from the notice and comment rulemaking procedures of the APA).

The City's argument about the bonus points suffers from the same flaws. The bonus points are provided to jurisdictions that permit federal immigration officials access to individuals who the jurisdictions are holding for their own criminal justice purposes, and, upon request, notice before those individuals are released back into the community. It is eminently reasonable for the Department to consider it sufficiently related to community-oriented policing whether a jurisdiction is releasing individuals whom the jurisdiction itself suspected of criminal conduct back into the community without providing federal officials with notice and access to those aliens. That judgment—which, as discussed, is permissible under the statute—does not depend on factual determinations of the sort Los Angeles demands. It simply requires asking whether the Department should blind itself to the degree of cooperation provided by localities to federal law enforcement efforts when distributing federal grants.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

CHAD A. READLER
*Acting Assistant Attorney General*

NICOLA T. HANNA
*United States Attorney*

MARK B. STERN
DANIEL TENNY
KATHERINE TWOMEY ALLEN

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*
*bradley.a.hinshelwood@usdoj.gov*

July 2018

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,543 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2018, I electronically filed the foregoing brief

with the Clerk of the Court for the United States Court of Appeals for the Ninth

Circuit by using the appellate CM/ECF system.  Participants in the case are registered

CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


*s/ Brad Hinshelwood*
Brad Hinshelwood