No. 18-55599

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CITY OF LOS ANGELES,

*Plaintiff-Appellee*,

v.

WILLIAM P. BARR, et al.,

*Defendants-Appellants*.

On Appeal From The United States District Court
For The Central District Of California

PETITION FOR REHEARING OR REHEARING EN BANC
OF PLAINTIFF-APPELLEE CITY OF LOS ANGELES

Mitchell A. Kamin
Neema T. Sahni
Jessica R. Hanson
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
(424) 332-4800

David M. Zionts
Ivano M. Ventresca
Benjamin L. Cavataro
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000

Michael N. Feuer
*City Attorney*
James P. Clark
*Chief Deputy City Attorney*
Kathleen A. Kenealy
*Senior Assistant City Attorney*
Leela A. Kapur
*Executive Assistant City
Attorney*
Valerie L. Flores
*Managing Senior Assistant City
Attorney*
Michael Dundas
*Deputy City Attorney*
200 North Main Street, City Hall
East Suite 800
Los Angeles, California 90012
(213) 978-8344

*Attorneys for Plaintiff-Appellee City of Los Angeles*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND RULE 35(B) STATEMENT ........................................... 1

BACKGROUND ......................................................................................... 2

REASONS FOR GRANTING THE PETITION ...................................................... 7

I.   The Decision Has Sweeping Implications On Issues Recognized By This Court To Be Of National Importance. ................................................... 8

II.  The Decision Conflicts With Decisions Of Other Courts. ........................... 11

III. The Decision Conflicts With Decisions Of The Supreme Court, This Court, And Other Circuits In According DOJ *Chevron* Deference. ............ 14

IV.  Alternatively, Panel Rehearing Is Warranted Because The Panel Overlooked Important Points of Law ........................................................... 18

CONCLUSION .......................................................................................... 20

CERTIFICATE OF COMPLIANCE ................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*City of Chicago v. Sessions*,
    888 F.3d 272 (7th Cir. 2018) ...............................................................9, 10, 13

*Commodity Futures Trading Comm'n v. Erskine*,
    512 F.3d 309 (6th Cir. 2008) ...............................................................15

*Global Tel*Link v. FCC*,
    866 F.3d 397 (D.C. Cir. 2017) ............................................................14

*Neustar, Inc. v. FCC*,
    857 F.3d 886 (D.C. Cir. 2017) ............................................................14

*Pakootas v. Teck Cominco Metals, Ltd.*,
    830 F. 3d 975 (9th Cir. 2016) .............................................................15

*Philadelphia v. Attorney General*,
    916 F.3d 276 (3d Cir. 2019) ...............................................................9, 13, 14

*Price v. Stevedoring Services of America, Inc.*,
    697 F.3d 820 (9th Cir. 2012) ..............................................................15, 16, 17

*Robbins v. Reagan*,
    780 F.2d 37 (D.C. Cir. 1985) ..............................................................7, 11

*San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) .............................................................*passim*

*SoundExchange, Inc. v. Copyright Royalty Bd.*,
    904 F.3d 41 (D.C. Cir. 2018) ..............................................................15

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ...........................................................................15, 16, 17

**Statutes**

34 U.S.C. § 10381(a) ..............................................................................7

34 U.S.C. § 10381(b) .............................................................................1, 3, 7, 12, 19

34 U.S.C. § 10381(c) ............................................................................6, 13

34 U.S.C. § 10388.................................................................................17

Violence Against Women And Department Of Justice Reauthorization
  Act of 2005, Pub. L. No. 109-162, January 5, 2006, 119 Stat. 2960,
  § 1163......................................................................................................19

Violent Crime Control and Law Enforcement Act (VCCLEA) Pub. L.
  103-322, title 1, § 10002 ............................................................3, 5, 7

## INTRODUCTION AND RULE 35(B) STATEMENT

This case is at the intersection of two matters of national importance. One has never provoked controversy: the decades-old congressional policy of supporting "[m]ore 'cops on the beat'" to work in partnership with local communities, a policy that has "proved enormously politically popular and, more importantly, measurably contributed to public safety." Dissent 38. The other is vigorously debated: whether States and local communities should participate in federal immigration enforcement. This Court has rejected unilateral efforts by the President "to withdraw federal grant moneys from jurisdictions that do not agree with the current Administration's immigration strategies," and in doing so has emphasized "the importance and divisiveness" of these questions. *San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018).

Barred from directly withdrawing federal grant funding, the Department of Justice ("DOJ") set out to achieve the same objective by repurposing the COPS grant program, which Congress created to support the hiring and rehiring of police officers "for deployment in community-oriented policing." 34 U.S.C. § 10381(b)(1)-(2). In 2017, "DOJ decided to usurp the COPS funds for its own immigration policy directives." Dissent 34. Specifically, DOJ announced that it would accord preferential treatment to applicants that partner with federal immigration authorities in particular ways – without articulating any connection

1

between such federal-state partnerships and the statutory objective of community-oriented policing. DOJ further said it would give preference to applicants pledging to use grant funds to participate in immigration enforcement activities such as "honoring detainers" – again without explaining how this could have anything to do with the deployment of police officers for community-oriented policing.

The divided panel's endorsement of this overreach warrants rehearing. The underlying issues are of exceptional importance – they are "important and divisive" and raise profound separation of powers questions. At stake is the usurpation of federal funds, diverting them from Congress's express purpose in service of an agency's unilateral policy agenda. The decision is a blueprint for future misuse of federal grants, and conflicts with a number of other decisions. And in basing its decision on *Chevron* deference (which DOJ had not sought), the panel created conflicts with the administrative law decisions of the Supreme Court, this Court, and other circuits.

## BACKGROUND

Since 2017, the Executive Branch has sought to use federal funds as a "weapon" to "cripple jurisdictions that do not assist in enforcing federal immigration policy." *San Francisco*, 897 F.3d at 1243. Thus far, those efforts have been enjoined. This case concerns a slightly different approach toward achieving the same objective.

Congress enacted the COPS Hiring Program for the express "purpose[]" of assisting State and local governments in hiring or re-hiring "law enforcement officers for deployment in community-oriented policing." 34 U.S.C. § 10381(b)(1)-(2). As explained by Judge Wardlaw, "the term 'community-oriented policing' had in 1994 and has through today a commonly understood meaning." Dissent 34. Consistent with that meaning, the statute creating the COPS program records its purpose as to "substantially increase the number of law enforcement officers interacting directly with members of the community." Violent Crime Control and Law Enforcement Act (VCCLEA) Pub. L. 103-322, title 1, § 10002(1). DOJ's COPS Office likewise understands community-oriented policing as being based on "a commitment to building trust and mutual respect between police and communities." SER2.

Traditionally, DOJ allocated COPS grants to States and localities according to the strength of the applicant's proposal to implement community-oriented policing, and the law enforcement and fiscal circumstances supporting the need for federal support for officers to be deployed in community-oriented policing. In 2017, DOJ departed from this tradition.

First, DOJ created a new "Focus Area" for grants that address "Illegal Immigration," offering preferential treatment for applicants choosing that Focus Area. Ordinarily, Focus Areas are flexible, giving communities latitude to apply

principles of community-oriented policing to particular law enforcement challenges. Dissent 54-55. The Illegal Immigration Focus Area, by contrast, mandates four specific activities: "partnering with the federal law enforcement to address illegal immigration for information, 287(g) partnerships, task forces and honoring detainers." ER70. DOJ did not explain how such activities could relate to community-oriented policing. *See* Dissent 55-56.

Second, after FY 2017 grant applications were already submitted, DOJ sent a letter to applicants stating that it would provide "additional consideration to state, local, or tribal applicants that cooperate with federal law enforcement to address illegal immigration." ER144. To receive this preferential treatment, a State or local government had to submit a "Certification of Illegal Immigration Cooperation." This committed the applicant to implement "rules, regulations, policies, and/or practices" to (i) guarantee DHS "access to any of the governing body's correctional or detention facilities in order to meet with an alien," and (ii) "provide advance notice . . . to DHS regarding the scheduled release date and time of an alien." ER147.

This Certification was separate from an applicant's proposed use of grant funds. Again, DOJ did not articulate a connection between this participation in federal immigration enforcement and the grant's statutory purpose of deployment of officers for community-oriented policing. Instead, the Attorney General

4

announced in generic terms that "cooperat[ion] with federal law enforcement make[s] all of us safer," and expressed his "hope" that this "priority consideration" would "incentivize every jurisdiction in America to collaborate with federal law enforcement." SER18. When 2017 grant awards were announced, the Attorney General boasted that "80 percent of this year's COPS Hiring Program grantees have agreed to cooperate with federal immigration authorities in their detention facilities." SER21. That announcement asserted that such partnership would help "end[] violent crime," but still did not suggest any connection to community-oriented policing. *Id.*

The City of Los Angeles filed this lawsuit claiming, *inter alia*, that DOJ lacked statutory authority to give preferential treatment to COPS applicants based on their participation in federal immigration enforcement. The district court agreed and enjoined these considerations. DOJ did not seek a stay, but it also refused to make grant decisions without giving preferential treatment based on immigration considerations. Instead, it suspended the COPS Hiring Program, and in FY 2018 did not spend the funds Congress had appropriated.

A divided panel reversed. Even though DOJ had not invoked *Chevron* deference, and had not engaged in the relatively formal interpretive exercise generally required for such deference, the majority applied a "highly deferential standard" of review. Op. 21. It concluded that "[n]othing in the Act precludes

5

DOJ from allocating federal funds to state or local governments to focus on problems raised by the presence of illegal aliens within their jurisdictions." Op. 22. It held that preferential treatment for applicants certifying that they will provide notice and access to DHS "is consistent with the Act's purpose to enhance public safety." Op. 25. And it held that the phrase "community-oriented policing" need not be limited to "interactions between law enforcement and the community." Op. 27.

Judge Wardlaw dissented. She explained the well-understood meaning of "community-oriented policing," and Congress's express goal of putting more "cops on the beat" to interact with the local community. Dissent 35-43. Judge Wardlaw highlighted the conflict between DOJ's claim of authority and the statutory structure, which expressly – but narrowly – authorizes the Attorney General to grant preferential consideration based on just one particular law enforcement policy choice (related to treatment of trafficking victims). Dissent 53-54 (discussing 34 U.S.C. § 10381(c)).

Judge Wardlaw found it "difficult to see how awarding a grant for state or local police to act as federal immigration officers furthers the congressional purpose of community-oriented policing," and that "DOJ offers no explanation plausibly connecting detainer requests to 'enhanc[ing] police-community cooperation.'" Dissent 55-56 (quoting H.R. Rep. No. 103-324, at 9). She likewise

6

found that "providing federal immigration authorities advance notice of detainees' release and access to local jails, as the Cooperation Certification demands, is completely untethered to 'the principles of community policing' authorizing the COPS grant program." Dissent 56. The dissent concluded that "[b]y enacting the COPS grant program, Congress did not authorize DOJ to coopt local and state officers into carrying out the current or any other presidential administration's agenda, unrelated to community-oriented policing." Dissent 59.

## REASONS FOR GRANTING THE PETITION

As Judge Wardlaw recognized, this case concerns nothing less than a federal agency "usurping" federal funds. Congress directed the Attorney General to "make[] grants to States [and] local governments . . . for the purpose[]" of hiring or re-hiring law enforcement officers "for deployment in community-oriented policing." 34 U.S.C. §§ 10381(a), (b)(1)-(2). Congress made it clear that the objective of this grant program is to "substantially increase the number of law enforcement officers interacting directly with members of the community ('cops on the beat')." VCCLEA § 10002(a). So it should have been straightforward to conclude that in making grant determinations, DOJ must do so "based on factors solely related to the goal of implementing the stated statutory purposes." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985). Yet "[a]side from abstract allusions to public safety, DOJ has never articulated how the federal immigration

7

preferences relate to community-oriented policing." Dissent 51. This approach strips the words "community-oriented" from the statute: "[a]ll policing is ultimately designed with public safety in mind," but "all policing is not *community-oriented* policing." Dissent 58 (emphasis added). A community's judgment that it is less safe when it participates in immigration enforcement has nothing to do with the soundness of its proposal for putting more "cops on the beat" to "interact directly with members of the community."

Over a strong dissent, the panel implied a sweeping delegation of authority to make community policing grants on the basis of factors "completely untethered" to community policing. Dissent 56. En banc review is warranted.

## I. The Decision Has Sweeping Implications On Issues Recognized By This Court To Be Of National Importance.

In recent years there has been extensive litigation over the use of federal grant money to induce State and local participation in federal immigration enforcement. The panel decision makes the Ninth Circuit the first to authorize such Executive overreach. In doing so, it raises profound separation of powers issues and provides a blueprint for DOJ and other agencies to misuse federal funds to advance their own policy agenda – and to defy Congress's.

1. This Court has recognized the "importance and divisiveness" of the question whether States and local communities should participate in federal immigration enforcement. *San Francisco*, 897 F.3d at 1234. Many communities

have concluded, based on significant evidence, that local entanglement with immigration enforcement harms public safety. *See City of Chicago v. Sessions*, 888 F.3d 272, 280-81 (7th Cir. 2018). In *San Francisco*, this Court invalidated an Executive Order purporting to withhold federal funding from such States and localities. 897 F.3d at 1234-35. By imposing its own answer to this important policy question, the Executive Branch "attempted to coopt Congress's power to legislate." *Id.*

DOJ also attempted to attach immigration-related conditions to specific federal grants having nothing to do with immigration. That effort was also rejected. The Seventh Circuit rejected the Attorney General's use of "the sword of federal funding to conscript state and local authorities to aid in federal civil immigration enforcement." *Chicago*, 888 F.3d at 277. That court remarked that DOJ's insistence that it could unilaterally insert questions of immigration participation into a federal grant program "evinces a disturbing disregard for the separation of powers." *Id.* at 283; *see also Philadelphia v. Attorney General*, 916 F.3d 276 (3d Cir. 2019).

This case presents a slightly different method of achieving the same objective. The divided panel broke new ground, becoming the first to endorse a path for the Executive Branch to use federal funds in aid of its controversial position on State and local involvement in immigration enforcement. Given "the

9

importance and divisiveness of the policies in play," *San Francisco*, 897 F.3d at 1234, and the "disturbing disregard for the separation of powers" in pursuit of those policies, *Chicago*, 888 F.3d at 283, the issues in this case are exceptionally important.

2. The implications for the COPS grant are sweeping in their own right. The policy that *Congress* chose – federal funding to put "[m]ore 'cops on the beat'" to interact directly with the community – is "enormously politically popular" and has "measurably contributed to public safety." Dissent 38. Congress has backed up this policy with significant, and consistent, investments of federal dollars, appropriating on average more than $150 million annually. *See* ER20-21. A federal agency's decision to "usurp" such funds to advance its own agenda is exceptionally important.

Moreover, as the dissent points out, the panel decision licenses future mischief with this important grant program, so long as DOJ can claim some nexus to "public safety." "Today's political agenda is to increase federal immigration enforcement; tomorrow's may be to increase enforcement of federal gun registration and licensing." Dissent 59 n.48. Or DOJ could favor COPS applicants that abolish capital punishment, or that more aggressively prosecute marijuana offenses, or that legalize marijuana. If DOJ can use the COPS program to advance its own perspective on "important and divisive" immigration questions, there is

little limit to the important and divisive policy questions that may become the basis of future grant decisions.

3. These implications are not limited to the COPS grant. DOJ takes the position that "any other agency administering a discretionary grant program" has the same "substantial discretion" it exercised here. DOJ Reply Br. 1. There are innumerable discretionary grant programs administered by federal agencies. If DOJ can use immigration policy as the basis for preferential treatment in a community-oriented policing grant, without "articulat[ing] how the federal immigration preferences relate to community-oriented policing," Dissent 51, then it will be just as easy for agencies to claim expansive authority to advance their own policy agendas at the expense of Congress's across a range of grant programs.

## II.   The Decision Conflicts With Decisions Of Other Courts.

The panel decision also conflicts with decisions of other courts.

1. The D.C. Circuit has held that "[w]hen Congress limits the purpose for which a grant can be made, it can be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins*, 780 F.2d at 48.

The express statutory purpose of the COPS Hiring Program grant is to hire and rehire "law enforcement officers for deployment in community-oriented

policing." 34 U.S.C. § 10381(b)(1)-(2). The dissent would have followed the D.C. Circuit's approach by requiring DOJ to make grant decisions based on factors related to this express statutory purpose. Dissent 52. But the majority permitted DOJ to adopt preferential treatment for applicants adhering to its preferred immigration policies, without ever "articulat[ing] how the federal immigration preferences related to community-oriented policing" – that is, to the statute's express purpose. Dissent 51.

2. The decision is in tension, at a minimum, with decisions rejecting similar efforts to link State and local participation in immigration enforcement with federal funding. In holding that the President's Executive Order violated the separation of powers, this Court held that "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *San Francisco*, 897 F.3d at 1235. Here, the panel undermined that holding through an expansive view of what "congressional authorization" may entail. Without a hint in the statute that State-federal immigration partnerships have any relationship to community-oriented policing, the panel authorized DOJ to allocate duly-appropriated federal funds based on the Executive's "own policy goals."

The panel decision also conflicts with the approach followed by the Third and Seventh Circuits in rejecting immigration conditions on the Byrne JAG

12

program.  Although the nature of that grant, and the particular manner in which
immigration was used, differs from this case, one aspect of the Third and Seventh
Circuits' reasoning is fully applicable here.

The Byrne JAG statute "give[s] the Attorney General narrow authority to
withhold or re-allocate funds under very limited circumstances."  *Philadelphia*,
916 F.3d at 285.  These provisions "highlight what they do not authorize," *i.e.*,
DOJ's claim to more sweeping authority to condition grant funds "for any reason
the Attorney General chooses."  *Id.* at 286; *see Chicago*, 888 F.3d at 287 ("[T]he
Byrne JAG statute provides the Attorney General authority over a carefully
delineated list of actions, with no such broad authority to impose reasonable
conditions.").

The same reasoning should have applied here.  Section 10381 expressly, but
narrowly, authorizes the Attorney General to "give preferential consideration" to
applicants that adopt a specific law enforcement policy – leniency for trafficking
victims – that is not specifically tied to the community-oriented policing purpose
of the grant.  34 U.S.C. § 10381(c).  As in the Byrne JAG cases, "[t]he clear import
of this section demonstrates Congress's intention to authorize DOJ to accord
preferences beyond community-oriented policing only where it expressly
authorizes DOJ to do so."  Dissent 53.

The panel responded that "nothing in that section limits DOJ's discretion to select additional factors" for preferential treatment. Op. 29. But the same could have been said of the narrow authorizations in the Byrne JAG statute. Rather than dismissing the statutory structure as irrelevant, the Third and Seventh Circuits found narrow authorizations important because they "highlight what they do not authorize." *Philadelphia*, 916 F.3d at 286.

## III. The Decision Conflicts With Decisions Of The Supreme Court, This Court, And Other Circuits In According DOJ *Chevron* Deference.

In accepting DOJ's overreach, the panel never concluded that the *best* reading of the statute is that DOJ is authorized to base COPS grant decisions on an applicant's immigration-related policies. Rather, the panel invoked *Chevron* and applied a "highly deferential standard" of review. Op. 21. This reflected two significant errors further supporting en banc review.

1. Although *Chevron* deference features prominently in the majority opinion, DOJ did not invoke it in its briefing. *See* Oral Argument 5:54 (Judge Bybee: "You didn't cite *Chevron* in your brief."). The D.C. Circuit has held that "it would make no sense" to accord *Chevron* deference where "the agency no longer seeks deference." *Global Tel*Link v. FCC*, 866 F.3d 397, 407-08 (D.C. Cir. 2017); *see Neustar, Inc. v. FCC*, 857 F.3d 886, 893-94 (D.C. Cir. 2017) (agency "forfeited

any claims to *Chevron* deference").[1]  Likewise, the Sixth Circuit has held that an

agency "waive[s] any reliance on *Chevron* deference by failing to raise it to the

district court." *Commodity Futures Trading Comm'n v. Erskine*, 512 F.3d 309,

314 (6th Cir. 2008).  Relatedly, this Court has held that a claim of *Skidmore*

deference was waived, observing that the belated argument raised difficult issues

that had not been briefed.  *Pakootas v. Teck Cominco Metals, Ltd.*, 830 F. 3d 975,

986 n.12 (9th Cir. 2016).  The panel's application of *Chevron* deference, without

any request for such deference before the district court or in the briefs before this

Court, is inconsistent with these decisions.

2.  Had DOJ made an argument for *Chevron* deference, the City would have

had an opportunity to explain why according such deference here is inconsistent

with decisions of the Supreme Court and this Court sitting en banc: *United States*

*v. Mead Corp.*, 533 U.S. 218 (2001) and *Price v. Stevedoring Services of America,*

*Inc.*, 697 F.3d 820 (9th Cir. 2012).

"In *United States v. Mead Corp.*, the Supreme Court held that *Chevron*

deference applies only when: (1) 'it appears that Congress delegated authority to

the agency generally to make rules carrying the force of law' *and* (2) 'the agency

---

[1] Agency counsel cannot forfeit *Chevron* deference when the agency itself
"manifests its engagement in the kind of interpretive exercise to which review
under *Chevron* generally applies." *SoundExchange, Inc. v. Copyright Royalty Bd.*,
904 F.3d 41, 54 (D.C. Cir. 2018).  DOJ did not come close to engaging in such an
exercise here.  *See infra* pp. 16-18.

interpretation claiming deference was promulgated in the exercise of that authority.'" *Price*, 697 F.3d at 826 (quoting *Mead*, 533 U.S. at 226-27) (emphasis in original).

Under *Mead*, agency interpretations warranting deference typically arise from "a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement [having the force of law]." 533 U.S. at 230. By contrast, an agency's interpretation "advanced through [its] litigating position," which is not adopted "through any 'relatively formal procedure' but through internal decisionmaking not open to public comment or determination," falls "'beyond the *Chevron* pale.'" *Price*, 697 F.3d at 827 (quoting *Mead*, 533 U.S. at 231, 234) (cleaned up). That is because there is no indication that the agency has "undertake[n] careful deliberation about how best to effectuate statutory policies," where the agency "takes pains to understand and effectuate the congressional intent underlying the statute." *Id.* at 829.

Contradicting *Price*, the panel here deferred to DOJ's litigating position. Far from there being any "relatively formal administrative procedure," the record reflects a bare announcement of the agency's immigration preferences, without any apparent consideration of whether they "effectuate the congressional intent underlying the statute." *Id.* For example, the letter adding the Certification Consideration simply stated "additional consideration" would be given to

16

applicants "that cooperate with federal law enforcement to address illegal immigration." ER144. There is no evidence in that letter, in the Attorney General's announcement (SER18), or anywhere else that the agency engaged in "careful deliberation about how best to effectuate statutory policies" concerning community-oriented policing, *Price*, 697 F.3d at 829. *Supra* pp. 4-5. To the contrary, the agency *never* explained what it thought access and notice to DHS had to do with hiring police officers for deployment in community-oriented policing; it simply asserted such measures "make all of us safer." *Supra* pp. 4-5. Certainly nothing in the record hints at DOJ's eventual litigating position that "community-oriented policing" could encompass *federal-state* partnerships rather than *police-community* partnerships.

The panel also contradicted *Mead* by invoking DOJ's "broad authority to 'promulgate regulations and guidelines to carry out'" the statutory subchapter. Op. 21 (quoting 34 U.S.C. § 10388). In *Mead* too, the agency had "general rulemaking power" under a statute that "authorizes some regulation with the force of law." 533 U.S. at 232. But if the mere existence of "general rulemaking power" were enough, *Mead* would have been decided differently. Instead, "*Mead*'s second requirement" is that the agency must *exercise* such authority. *Price*, 697 F.3d at 826. Yet in the administrative record, before the district court, and before this Court, DOJ never invoked Sections 10338 or 10382(b) – the source of DOJ's

17

"broad authority," according to the panel. Whatever "general rulemaking power" the statute might contemplate, DOJ was not *exercising* such authority when it simply acted without explanation, and only later cobbled together a litigating position straining to connect immigration preferences to community-oriented policing.

## IV.   Alternatively, Panel Rehearing Is Warranted Because The Panel Overlooked Important Points of Law

1.   The panel's misapplication of *Chevron* deference also warrants panel rehearing, because the panel overlooked DOJ's waiver of deference, and its inapplicability under binding precedent.

2.   The panel also overlooked the governing statutory text. The panel concluded that "[a] jurisdiction's willingness to provide notice that a detained removable alien will be released from custody, or to provide facility access so that federal officials can interview removable aliens while in custody, is consistent with the Act's purpose to enhance public safety." Op. 25. In support of this broad purpose, the panel cited Section 1701(a) of the VCCLEA. *Id.*; *see also* Op. 27 (citing the same provision to conclude that the statutory purpose "go[es] far beyond interactions between law enforcement and the community").

As originally enacted, Section 1701(a) included the words "otherwise to enhance public safety." Whatever the import of that original language, *it has been repealed*. In 2006, Congress amended the statute to restructure the grant program

18

and amend the statutory authorization, deleting the language on which the panel relies. Violence Against Women And Department Of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, January 5, 2006, 119 Stat. 2960, § 1163. The governing version of the statute has no generic reference to "enhancing public safety." The *sole and express* statutory purpose of the COPS Hiring Program is hiring and re-hiring officers "for deployment in community-oriented policing." 34 U.S.C. § 10381(b). The panel's different view of "the statute's purposes" (Op. 27) was not based on the actual statute under which DOJ was acting.

3. The panel made a related oversight in relying on 34 U.S.C. § 10381(b)(4), which addresses "grants to pay for office[r]s hired to perform intelligence, anti-terror, or homeland security duties." The panel reasoned that Congress was pursuing a broad "public safety" purpose "through means including *both* community-oriented policing *and* attention to intelligence, anti-terror, or homeland security duties." Op. 25 (emphasis added) (citing 34 U.S.C. § 10381(b)(1)-(2), (4)).

But according to the agency official responsible for the COPS grant, the sole statutory authority for the COPS Hiring Program is 34 U.S.C. § 10381(b)(1)-(2). ER17. By contrast, "the COPS Office has always understood that the other provisions currently listed at Title 34, U.S. Code, Section 10381(b) – that is, Section 10381(b)(3) through (b)(22) – *do not authorize* the COPS Hiring Program,

19

but set forth *the purposes of other, separate grant programs* that the Office could offer *if* Congress appropriated funds for them."  ER18 (emphasis added).  By the agency's own admission, subsection (b)(4) is irrelevant to the statutory purpose of the COPS Hiring Program.

## CONCLUSION

The petition for rehearing should be granted.


DATED:      August 2, 2019                    Respectfully submitted,


                                              *s/* Michael N. Feuer
                                              Michael N. Feuer
                                                  *City Attorney*

Mitchell A. Kamin                             James P. Clark
Neema T. Sahni                                    *Chief Deputy City Attorney*
Jessica R. Hanson                             Kathleen A. Kenealy
COVINGTON & BURLING LLP                            *Senior Assistant City*
1999 Avenue of the Stars                           *Attorney*
Los Angeles, California 90067                 Leela A. Kapur
(424) 332-4800                                    *Executive Assistant City*
                                                   *Attorney*
David M. Zionts                               Valerie L. Flores
Ivano M. Ventresca                                *Managing Senior Assistant*
Benjamin L. Cavataro                               *City Attorney*
COVINGTON & BURLING LLP                        Michael Dundas
One CityCenter                                    *Deputy City Attorney*
850 Tenth Street NW                           200 North Main Street, City Hall
Washington, DC 20001                          East Suite 800
(202) 662-6000                                Los Angeles, California 90012
                                              (213) 978-8344

*Attorneys for Plaintiff-Appellee City of Los Angeles*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Circuit Rules 35-4(a) and 40-1(a) because it contains 4,197 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman and 14 point font.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 2, 2019.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

   *s/* Michael N. Feuer
Michael N. Feuer
*City Attorney*

*Attorney for Plaintiff-Appellee*
*City of Los Angeles*
